SPERRY FLIGHT SYSTEMS DIVISION OF SPERRY RAND CORPORATION

v.

The UNITED STATES.

No. 40–75.

United States Court of Claims.

Jan. 26, 1977.

Steven L. Cohen, Washington, D. C., for plaintiff. Daniel J. O'Neill, New York City, attorney of record. Chadbourne, Parke, Whiteside & Wolff, New York City, of counsel.

Alan L. Ferber, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and DAVIS and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

This contract case comes before the court on appeal by way of plaintiff's request for review of the opinion of Trial Judge John P. Wiese, filed on April 19, 1976, and defendant's motion to adopt that opinion with modifications. At issue is the finality, under Wunderlich Act standards, 41 U.S.C. §§ 321, 322 (1970), of a decision of the Armed Services Board of Contract Appeals (the board), which upheld the right of a contracting officer to require the submission of cost data from a contractor in support of a proposed catalog price for a commercial item being purchased by the Government on a negotiated procurement basis. *Sperry Flight Sys.—Div. of Sperry Rand Corp.,* ASBCA No. 17375, 74–1 BCA ¶ 10,648. The case has been submitted to the court on the briefs and oral arguments of counsel. Upon consideration thereof the court agrees with portions of the trial judge's opinion and adopts, with minor modifications, parts I and IIB of that opinion. Part IIA of the opinion is substantially revised, for the reasons set forth in the discussion of that part, below. As explained herein, the board's decision is affirmed.

## I. *Facts*

On October 31, 1969, plaintiff and the United States, acting through the Navy's Aviation Supply Office, entered into a 2-year contract pursuant to which plaintiff was to supply, upon order, various types of aeronautical equipment that it manufactured. This contract, more descriptively referred to by the parties as a basic ordering agreement, contemplated two types of orders, priced and unpriced. The priced order, as the name implies, was an order issued to the contractor by the Navy after price and delivery terms had been agreed upon; an unpriced order, on the other hand, meant an order issued in the absence of prior agreement on price.

The mechanics for the pricing of an unpriced order called for the contractor's submission of a proposed price for each item within 45 days after receipt of an order together with such price supporting information as the contracting officer might request. Within 60 days thereafter, the contracting officer was required to indicate whether the price quoted was acceptable to the Government or whether further negotiations would be necessary. In the event of a failure to agree on price, the matter was then to be resolved by resort to the standard "disputes clause" procedures.

On December 15, 1971, the order which eventually gave rise to this litigation was issued. It was an unpriced order calling for delivery of 660 model ML–1 remote compass transmitters, also sometimes referred to in the trade as flux valves. This is an electrical induction sensing device which measures the earth's magnetic field and it is used primarily in aircraft as part of a directional gyrocompass system. There had been three previous unpriced orders for ML–1 transmitters processed under the instant contract and on each of these past occasions the contractor had proposed and was paid its then current catalog price for the item. However, in this instance, the then newly assigned contracting officer declined to accept the contractor's proposed price, namely, its catalog price of $351 per unit, and asked instead for substantiating cost data. This data the contractor declined to furnish.

Then, and now, the refusal to supply the requested data rested on the contention that under the relevant statute, generally referred to as the Truth In Negotiations Act, 10 U.S.C. § 2306(f) (1970), and the procurement regulations issued pursuant thereto, such data was not to be required when—as was claimed to be the case here—the item involved was a commercial item previously sold in substantial quantities to the general public and the price proposed was either (i) the established catalog price for such item, or (ii) a price "based upon" such a catalog priced item.

There followed an extensive written exchange of views as well as negotiations between the parties, all of which proved fruitless. Thereafter, the contracting officer—whose initial request for cost data had, in the interim, been specifically approved by his superior—issued a final decision, which unilaterally established a price for the ML–1 at $204, and set forth specific reasons for the rejection of the contractor's proposed price of $351. These reasons, which were repeated among the board's own later findings in the matter, were the following. First, the catalog price of the ML–1 (*i.e.*, the proposed price) was not an acceptable pricing criterion to the Government because that unit had not been sold in substantial quantities to the general public. Second, the proposed price of the ML–1 could not be considered to be "based upon" the established catalog price of the functionally comparable "thin valve" because the latter unit, even though admittedly similar to the ML–1 and concededly sold in substantial quantities to the general public, had previously been sold to the Air Force at a price 42 percent less than its established catalog price. Third, the price at which the ML–1 unit had been sold by the company's manufacturing facility to its marketing facility (the intracorporate selling price) was only $138.78.

Based upon these three considerations, the contracting officer considered it inappropriate to accept the proposed price of $351. Instead, using certain limited financial data then available to him, he determined that a fair and reasonable price was $204. As a consequence of this determination, and plaintiff's disagreement with it, the matter was carried on to the board for hearing and determination, and the result there, as previously noted, was in favor of the contracting officer. The case here followed next.

## II. *Discussion*

### A. *Severance of Issues*

Before the board plaintiff requested and was granted a severance of the issues in the case. As a result of the severance, the board hearing and decision was limited to the question of plaintiff's entitlement to payment of its proposed catalog price without having to furnish supporting cost data. Postponed to a future date were the proceedings that would determine, at defendant's behest, the price payment to which plaintiff was entitled should it have been decided, in the first board decision, that plaintiff was required to furnish the cost data in support of its proposed price upon request of the contracting officer. Plaintiff sought this severance for the highly practical reason that it would need to bring in the cost data to counter a separate challenge by defendant to the contracting officer's decision that $204 was a reasonable and fair price, and yet, in plaintiff's counsel's words, "if we are to put in cost data at this time to meet the Government's objections with regard to the contracting officer's finding as to reasonable price, we moot the appeal [on the need to furnish cost data at all]." When plaintiff received the board decision adverse to it on the catalog price issue, it came directly to this court. Accordingly, the board has never had the opportunity to hear evidence and rule on defendant's challenge to the contracting officer's price determination.

Defendant argued to the trial judge that, since the board had yet to determine a reasonable price based on the disclosure of the cost data, this appeal was interlocutory and premature, and should not be heard until after further consideration by the board. The trial judge answered that well-settled practice, not outweighed by the judicial policy against piecemeal litigation, allows the court to decide an appeal "taken on a substantively important [to the outcome of the case] and distinctly severable issue * * * that has been treated as such by the Board and that has been fully acted upon by the Board." Cf. *Cutler-Hammer, Inc. v. United States,* 416 F.2d 1306, 1309, 189 Ct.Cl. 76, 81 (1969). Defendant no longer maintains this jurisdictional challenge, but now shifts its position to argue a point not explicitly raised before the trial judge. Defendant now says that if

the court finds against plaintiff on all the issues presently appealed from the board's decision, the case must return to the board for a determination of defendant's objections to the $204 price, then to be considered, of course, in light of the plaintiff's disclosed cost data. Plaintiff counters that it has a right to stand on the contracting officer's $204 price, which it expresses a willingness to do if it does not succeed in persuading the court on the catalog price issue, and accordingly opposes reopening the contracting officer's price decision. Since we resolve the issues in defendant's favor in part IIB, *infra,* it becomes necessary for us to address the effect of the severance of issues on defendant's entitlement to the price redetermination that it seeks.

First of all, we think it important to note what the parties are not contending. No issue is raised regarding the Government's right to question before the board its own contracting officer's decision that, even lacking the supporting cost data he previously requested of plaintiff and was refused, he had sufficient information available to him to determine that $204 was a fair and reasonable price for the ML–1. It is not contended that, by operation of law, plaintiff's recovery may not be reopened by the board and redetermined to be below that which the contracting officer allowed, nor is it argued that the Government's defense before the board and here is limited to supporting, not challenging, what the contracting officer decided. Both sides seem content to rely upon *Blount Bros. v. United States,* 424 F.2d 1074, 1084–085, 191 Ct.Cl. 784, 801–02 (1970), for the rule that proceedings at the board level are de novo and, therefore, that the Government counsel may present to the board whatever arguments he deems appropriate, even if these are at odds with the contracting officer's ruling. Further, it is not urged that the contracting officer's determination that he had sufficient information in front of him to choose a price figure for the ML–1 was discretionary and not subject, short of an abuse of discretion, to second-guessing by the board. The contracting officer was

not compelled to issue a ruling on price, of course, but could have declined to make any determination at all under Armed Services Procurement Regulation (ASPR) 3–807.6, 32 C.F.R. § 3.807–6 (1969), had he thought that plaintiff's refusal to yield its cost data left him too ill-informed. Finally, there is no challenge to the Government's right, assuming the applicability of our decision in *Roscoe-Ajax Constr. Co. v. United States,* 499 F.2d 639, 204 Ct.Cl. 726 (1974), to question the contracting officer's determination on sufficiency of price information even though plaintiff disputes only the officer's alleged disregard of plaintiff's legal entitlement to the payment of its catalog price. Since these matters have not been briefed or argued orally by the parties, we intimate no ruling on them.

Plaintiff bases its right to stand on the contracting officer's $204 price decision solely on a stipulation that the parties supposedly entered at the outset of the board hearing. Defendant denies that any agreement was reached allowing plaintiff to end this litigation with a $204-per-unit recovery, and our review of the transcript of the board proceedings persuades us that defendant is correct. Throughout the colloquy among counsel and the hearing examiner there was an assumption that the Government, if it prevailed in the first hearing, would further litigate before the board—assuming a settlement was not reached in the meantime—the correctness of the $204 price, and would do so with plaintiff's ML–1 cost data in hand. Plaintiff's counsel plainly acknowledged that the "Government has also put into issue, as is their right, the other finding of the contracting officer in terms of reasonable price." He then asked for the severance of the catalog price issue from the Government's challenge to the $204 price in order to avoid bringing in the supporting cost data to defend against the Government's challenge even as he was arguing that that data need not be furnished at all, as a matter of law. The Government counsel before the board responded that he had no objection to the severance stating:

[T]he board could never fix a price, a reasonable price, without cost data, and Sperry says that we don't have to furnish it. I suspect that the board would first have to say, "Sperry, you have to furnish cost data."

Then, if the parties cannot agree on pricing they would have to come back here.

This statement is hardly a stipulation that the litigation may end once plaintiff is informed that it may not withhold its cost data from the Government. Defendant clearly looked forward to arguing before the board, in the absence of a compromise settlement, that the cost data, perhaps together with the information that the contracting officer had in his possession, points toward a unit price other than $204.

■ Plaintiff makes much of the following exchange between hearing examiner Thompson and its own counsel, Mr. Cohen:

Mr. Thompson: \* \* \* I take it that Appellant [plaintiff here] agrees that if Appellant should lose on a catalog item issue, and so forth, the contracting officer's decision will stand as to the issue of reasonable price.

Mr. Cohen: Yes, Your Honor.

Mr. Thompson: It would not be necessary to render a new decision.

Mr. Cohen: No; no, it would not.

Plaintiff views these words as permission from the board for plaintiff to let the contracting officer's decision on price "stand." However, the Government counsel agreed to no such view, nor did the hearing examiner go beyond stating only that a new decision from the contracting officer would not be sought. In light of the parties' general understanding that the Government's challenge to the price determination was part of the appeal, the examiner could not have meant to say that a further decision could not be sought from the board on the Government's challenge, once the cost data were released and a settlement not reached. The examiner went on to state that "if the board did render a decision adverse to the Appellant on that [the catalog price] issue it would stand as a prelimi-

nary decision reducing the issues on the appeal and the appeal could simply stand in suspense, pending arrangements for disposing of the second problem [the Government's objection to the $204 price]." Further litigation on the price reasonableness issue, making use of the disclosed cost data, was thus clearly contemplated.

Since plaintiff's contention regarding the stipulation before the board is without merit, and since we agree with defendant on the points discussed in part IIB, the case may now proceed before the board on the Government's challenge to the reasonableness of the price set by the decision of the contracting officer.

### B. Catalog Price and Cost Data

As to the merits of the case, extensive reexamination of the board's decision is not called for. Two points compel a decision in the Government's favor. First, there is no legal support for the contractor's principal contention, namely, that the Government may not require cost data where it is involved in the negotiated purchase of a catalog-priced commercial item that is otherwise sold in substantial quantities to the general public. Even if the supportive facts were true, that is, that the item involved qualified as a commercial item that had previously been sold in substantial quantities to the public, still the argument would have no merit in this situation.

■ The statutory obligation to furnish cost and pricing data applies to every negotiated procurement where, as here, the amount involved is expected to exceed $100,000. And, to the extent that there may be exceptions to this requirement, such are wholly permissive in nature for the statute plainly says "[t]hat the requirements \* \* \* [for submission and certification of cost and pricing data] *need not be applied* to contracts \* \* \* where the price negotiated is based on \* \* \* established catalog or market prices of commercial items sold in substantial quantities to the general public \* \* \*." 10 U.S.C. § 2306(f) (1970). Clearly, the statutory language envisions no mandatory exemption

from cost disclosure such as plaintiff claims. It is urged that legislative history counsels a different reading of the quoted language, but, like the board we see nothing in the several references which plaintiff offers in support of this proposition that demonstrates any basis whatsoever for assuming that the words "need not be applied" should actually be read to say "shall not be applied." [Emphasis in above quote supplied.]

Nor is such a mandate to be found in the pertinent procurement regulations. Indeed, just the opposite is true. ASPR 3–800 through 3–813, 32 C.F.R. §§ 3.800–3.813 (1969) (Price Negotiation Policies and Techniques), make apparent, first of all, that Government procurement, when carried out on a negotiated contract basis, depends for its success on a well-informed contracting officer, one having knowledge not only of cost and pricing techniques in general, but also knowledge in particular of the product or service in question, including its uses and technology, its costs, alternate sources of supply and prevailing market prices. To this end, the regulations contemplate that various sources of information shall be made available to the contracting officer, including not only field audits, engineering studies and technical appraisals prepared by in-house staff, but also contractor-supplied cost and pricing data.

But equally as important as the need for reliable information in the negotiation process is the need also to recognize that the decision to contract—a responsibility that rests with the contracting officer alone—is

inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for. That effective contracting demands broad discretion is plainly recognized, for the regulations observe at the outset that "[s]ound pricing depends primarily upon the exercise of sound judgment * * *." ASPR 3–801.1.[1] Thus, in keeping with this theme, with respect to catalog-priced commercial items, the regulations undertake to set out no rigid set of standards by which to gauge price reasonableness. True, the regulations do say as to such items that "[a]s a general rule, cost or pricing data should not be requested," but the same regulation, ASPR 3–807.3(c), goes on to point out that if "despite the willingness of a number of commercial purchasers to buy an item at such a catalog or market price, the purchaser (*e.g.,* the contracting officer) finds that that price is not reasonable and supports such finding by an enumeration of the facts upon which it is based, cost or pricing data may be requested if necessary to establish a reasonable price * * *."[2]

In this case the contracting officer did reject the contractor's proposed price for lack of reasonableness—a consideration which brings us now to the second point for discussion. As noted earlier, among the grounds upon which the contracting officer had based his refusal to accept the contractor's proposed price was the fact that a cost-price analysis undertaken by the Government had reported the intracorpo-

---

1. The same point is said even more explicitly in later regulations. Specifically, by the time of the contracting officer's decision in this case, March 28, 1972, ASPR 3–807.3 (which deals in general with required cost and pricing data submissions), had been expanded to include, *inter alia,* the following language:

"(4) If the cost or pricing data required by paragraph (a) of this section is not adequate for the purpose, the contractor shall be required to support subcontract cost estimates below the minima set forth in paragraph (b)(1)(i) and (ii) of this section, by any additional data or information needed to establish a reasonable contract (not necessarily subcontract) price. *In the last analysis, the contracting officer must satisfy himself that the negotiated contract*

*price is reasonable.* For this purpose, he should require whatever additional contractor or subcontractor data is reasonably necessary. * * *." ASPR 3–807.3(b)(4) (1972) (emphasis added).

Although the quoted paragraph is aimed principally at insuring the adequacy of cost support for subcontractor pricing, the essential point here—and the point which the paragraph makes plain—is that, regardless of all supporting cost submissions, the contracting officer's final obligation is to "satisfy himself that the negotiated contract price is reasonable."

2. The quoted 1969 regulation, ASPR 3–807.3(c), has appeared as ASPR 3–807.3(f) in all regulations issued since 1973.

rate selling price of the ML–1 unit to be $138.78. In the testimony before the board that fact was brought out again and a finding to such effect was included by the board in its opinion.

■ In our view, the intracorporate selling price of the ML–1 unit, $138.78, was a factor sufficient by itself to justify the action that was taken by the contracting officer in rejecting the contractor's proposed price. Given the two figures which the contracting officer had before him—or, more to the point, the disparity between the two figures—it was altogether appropriate that he should decline to accept the proposed catalog price of $351 and insist, instead, upon substantiating cost data. Clearly, without the benefit of such data, the contracting officer would have been hard pressed to accept as reasonable a price to the Government that was fully two and one-half times greater than the seller's own indicated purchase cost. This is not to say, of course, that the price differentials might not have been entirely justifiable; there well might be appropriate justifications. We mean only to say that, given the circumstances, an explanation was clearly called for and the contracting officer was well within his rights under the regulations quoted above, in asking for the contractor's cost data.

There were also other grounds upon which the contracting officer had relied in supporting his request for cost data and these too were considered by the board. However, these additional grounds need not be examined anew, for whether the board was right or wrong with respect to the findings that it made concerning them is really beside the point. All that matters here is that the action taken by the contracting officer was authorized by law and that the action would stand as a proper exercise of his authority even if it were supported only by the single factual consideration discussed above, namely, the disparity between the proposed catalog price and the indicated purchase cost to the plaintiff. This was enough to lead one to conclude, at least initially, that the catalog price was not a reasonable price.

■ Nor would it matter that in procurements of the ML–1 subsequent to the one in issue, the Government consented to pay the proposed catalog price without demanding the submission of cost data. It has been pointed out that the decision as to whether or not to contract at a particular price is inherently a matter of judgment—a circumstance which can obviously yield differing results depending upon the individual administrator and the facts before him. Accordingly, the decision that was made by the contracting officer in this instance cannot be made either right or wrong by the contrast with the judgment others have chosen to follow. The only question is whether what was done by the contracting officer in *this* procurement was done in accordance with authority granted by the law. As to this last point, no question can seriously be raised: ASPR 3–807.3(c) expressly declares that cost data may be requested if a contracting officer finds, for reasons he has enumerated, that a proposed catalog price is not reasonable. There was a plainly sufficient reason presented in this case. In short, it is the instant contracting officer's judgment that counts; not the judgment of others who may succeed him.

There is a further argument made by plaintiff which addresses the fact that all previous Navy procurements of the ML–1 were completed without cost data submissions. Based upon this fact, plaintiff advances the contention that the Government may not now reverse course and abandon a practice upon which plaintiff has come to rely.

■ This argument too lacks merit. Although departure from practices previously adhered to by an agency in the administration of its contracts may, under certain circumstances, furnish the basis for an actionable claim against the United States, *see L. W. Foster Sportswear Co. v. United States,* 405 F.2d 1285, 1290–291, 186 Ct.Cl. 499, 509 (1969), it is essential in such situations that this sequence of previous conduct between the parties to the agreement (*i.e.,*

their course of dealing) be such that it can be "fairly * * * regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Restatement (Second) of Contracts § 249 (Tent. Drafts Nos. 1–7, 1973). In other words, a course of dealing can supply an enforceable term to a contract (or may even supplement or qualify that contract) provided that the conduct which identifies that course of dealing can reasonably be construed as indicative of the parties' intentions—a reflection of their joint or *common* understanding.

Such was the case, for example in *L. W. Foster Sportswear Co. v. United States, supra,* where this court held that the Government could not insist upon performance in strict accordance with contract requirements when, in previous instances involving plaintiff's manufacture of the same item under essentially identical specifications, the closely related predecessor procuring activity had habitually recognized the need for, and allowed, deviations from its specified requirements. Regarding that situation, the court said:

> * * * Both the plaintiff and the Navy were aware of this past history, and necessarily relied upon it in entering into new contracts of the same type. We have no doubt that plaintiff would have a sound claim if the Navy had abruptly changed its practices under the same contract specifications. We likewise have no doubt that plaintiff would not have to indicate at the time it bid on the successor Navy contracts that it expected to obtain the same deviations. * * *.
> [405 F.2d at 1290–1291, 186 Ct.Cl. at 509.]

■ No comparable fact situation exists in this case. The reliance argument that plaintiff makes here is, at best, only a statement of its own unilateral assumptions concerning the Navy's expected future conduct. No facts are offered that would establish or even allow an inference that the Government, by having accepted plaintiff's catalog prices on past occasions, thereby intended to commit itself to continue such a

practice into the future. Not only would there be no contractual purpose served by such a commitment, to the contrary, the idea abridges the flexibility that the Government must necessarily retain in order to carry out its purchases properly on a negotiated basis. In effect, what plaintiff argues for is a contract right that would undermine the authority and responsibility vested in a contracting officer to obtain for the Government the benefit of fair and reasonable prices. Even assuming such a result could lawfully be brought about, nothing has been shown here that would justify placing the Government in so irretrievable a position.

## CONCLUSION

For the reasons hereinbefore stated, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed.

DAVIS, Judge, concurring:

Joining in the court's opinion, I add some further considerations which, as I see it, puncture this plaintiff's claim even if one disagrees with the broader proposition that contracting officers have a general discretion to demand cost data whenever there is some preliminary reason to believe the demanded price may be excessive.

The contractor's case rests at bottom on its argument that the regulation affirmatively gave it a flat exception from the cost data requirement because the price of the flux valve (the ML–1 model) was an established catalog price of commercial items sold in substantial quantities to the general public, or at least was "based upon" the "thin valve" which did meet those characteristics. One can accept arguendo the contention that items satisfying these specific criteria are automatically exempted from the cost data requirement without holding for this plaintiff. The Armed Services Board of Contract Appeals confronted the point by finding that in any event the par-

**924**

ticular standards (on which plaintiff relies) were not satisfactorily met. First, the Board found in effect that the ML–1, though a catalog item, was not sold in substantial quantities to the general public—without doubt this determination had solid support in the record. Second, the Board found in substance that the catalog price of the ML–1 was not "based upon" the price of the "thin valve"; for this finding the tribunal largely rested, and quite properly, on the express testimony of plaintiff's marketing manager that the ML–1 price was not based on the price of the "thin valve" but on a number of factors.[1]

Another part of the regulation secondarily invoked by plaintiff limits, in the case of substantially similar items not technically "based on" the price of a publicly vended catalog item, the requirement for cost or price data "to that pertaining to the differences between the items" (*i.e.* between the item in question and the "similar" item sold publicly in substantial quantities) but only "if this limitation is consistent with assuring reasonableness of pricing result."[2] On the basis of the factors already mentioned plus the sole-source nature of the ML–1 and "the ability of the Air Force to obtain lower prices on the more complex thin unit," the board permissibly concluded, in my opinion that the contracting officer could permissibly determine that in this instance the limitation was *not* consistent with assuring reasonableness of pricing result—that unanswered questions of reasonability still remained, even though the ML–1 and the "thin" unit might be "similar."

It follows that, even under the specific parts of the regulation on which plaintiff grounds its claim, it is not entitled to recover.

1. The Board referred to "the lack of any apparent relationship (confirmed by the quoted testimony of appellant's marketing manager) between the price of the ML–1 and the price of the thin unit * * *."

2. This portion of the regulation provided (3.807.3(c)): "Where an item is substantially similar to a commercial item for which there is an established catalog or market price at which

substantial quantities are sold to the general public, but the offered price of the former is not considered to be based on the price of the latter in accordance with 3–807.1(b)(2), any requirement for cost or pricing data should be limited to that pertaining to the differences between the items *if this limitation is consistent with assuring reasonableness of pricing result*" (emphasis added).