UNITED COMPUTER SUPPLIES, INC./
Cole Computer Forms/McCall's Printing
Express, Joint Venture, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–142C.

United States Court of Federal Claims.

April 2, 1999.

Frederic G. Antoun, Jr., Chambersburg, PA, for plaintiff.

Andrea I. Kelly, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Kerry L. Miller, Government Printing Office, of counsel.

## OPINION

MILLER, Judge.

This Wunderlich Act, 41 U.S.C. §§ 321–322 (1994), review case before the court after argument on cross-motions for summary judgment, addresses the arcana of print orders. To be resolved is whether a contractor should be compensated for responding to an order for forms with a product that the Government claims was noncompliant with the underlying contract, but not the order, although the same forms had been accepted under similar prior orders.

## FACTS

The following facts derive from the record before the Government Printing Office Board of Contract Appeals (the "GPOBCA"). On October 29, 1992, the Government Printing Office (the "GPO") issued an Invitation for Bids for Program C384–S, a one-year fixed-price requirements contract for the procurement of multiple-part carbonless paper sets[1] for the National Institute of Health ("NIH"). The contract described the products to be ordered as "multiple-part carbonless paper sets, fan apart [2] or equal, and/or pads requiring such operations as film making, composition, printing, cutting, drilling, perforating, numbering, padding, packing, and delivery."

The trim size[3] for each format to be ordered under the contract ranged from 3 x 5" to 8½ x 11". The contract also indicated that the occasional order might require horizontal or vertical perforations. With respect to binding, the contract stated:

Multiple-part sets shall be collated, trimmed to size and joined into sets by "edge bonding" using a special adhesive made for this purpose, that will hold individual parts of a set together during fill-in and normal handling, but which allows ready separation of the parts without damage to the parts. Parts shall be joined into sets at the edge specified on individual print orders.

On December 3, 1992, the GPO awarded the contract for Program C384–S to United Computer, Inc., ("plaintiff"), a joint venture comprised of United Computer Supplies, Inc., Cole Computer Forms, and McCall's Printing Express. Beginning on December 1, 1992, and ending on November 30, 1993, this contract authorized NIH, as the ordering agency, to issue print orders and furnish camera copy and other required materials directly to plaintiff. The contract incorporated by reference the GPO publication, "Contract Terms" (GPO Pub. 310.2), which provides, in pertinent part:

Awards by GPO for printing, binding, and related services are the sole responsibility of GPO and not of its customer agencies.

---

1. Multiple-part carbonless paper sets are the forms covered by Program C384–S. They consist of multiple-page forms trimmed on all four sides to size and fastened together at the top with fan-apart adhesive.

2. "Fan apart" refers to a method of joining carbonless paper with an adhesive made for that purpose.

3. It is undisputed that the 8½ x 11" specification in the contract refers to the size of the forms. However, the parties disagree on whether the term "trim size" refers to the size of the paper before or after the ½" stubs have been removed.

Modification shall have no force or effect unless addressed before the fact to and subsequently confirmed in writing by the Contracting Officer. Failure to comply with this article may be cause for nonpayment of additional costs incurred or rejection of the order.[4]

The contract award letter dated December 3, 1992, from GPO Contracting Officer Jack Scott also explained that "[r]epresentatives of the ordering agency do not have authority to alter or change the specifications, [or] contract terms...."

The instant contract was not the first awarded to plaintiff under Program C384–S; plaintiff was awarded predecessor contracts under the Program in 1992 and 1991. The scope of the 1992 contract and that of the instant contract—the 1993 contract—are almost identical. Under each of these three contracts, NIH had ordered numerous snap sets,[5] fan apart sets, edge-glued sets, and continuous forms. Specifically, in 1992 and 1993, NIH ordered Form Nos. 2555 and 2556, both of which are marginally-punched, multiple-part continuous forms under Program C384–S. The print orders at the center of the instant dispute—80163 and 80164—involve these same forms.

On September 22, 1993, Anita Glinton, a NIH specialist, issued Print Order 80163 to plaintiff. The plaint order called for the production of 120,000 six-part marginally-punched continuous forms[6] measuring 9 ½ x 11". On the same day, Ms. Glinton also issued Print Order 80164 calling for the production of 60,000 six-part marginally-punched continuous forms measuring 9 ½ x 11". These forms were joined in sets by crimping in the right and left margins instead of using special edge binding adhesive specified in the contract. In addition, Print Orders 80163 and 80164 called for multiple holes smaller than ¼" along both the left and right martins of the form. This specification differed from that in the contract which permitted ¼" or ⅜" holes in either the top or the left of the form. The marginally-punched continuous forms identified by both orders also contained vertical perforations running the length of the form on both sides.

Plaintiff produced the marginally-punched continuous forms in accordance with the terms of the print orders and delivered the products to NIH. Plaintiff billed the GPO $93,230.80 for Print Order 80163: $70,092.00 for perforations, and $23,138.80 for printing, binding, and paper. The cost of Print Order 80164 totaled $41,890.90: $35,046.00 for perforations, and $6,844.90 for printing, binding, and paper.

On November 5, 1993, GPO's Financial Management Service paid plaintiff $88,569.26 ($93,230.80 minus the 5% prompt payment discount) on Print Order 80163 and $39.796.35 ($41,890.90 minus the 5% prompt payment discount) on Print Order 80164. After the GPO charged the cost of Print Orders 80163 and 80164 to NIH, Reginald Russell, Chief of NIH Printing Procurement Section, noticed that the amount paid was approximately ten times greater than NIH had paid for similar products in the past. Notice of this excessive charge reached Mr. Scott. Mr. Russell posited that the similar

---

4. The GPO Agency Procedure Handbook contains a similar provision:

> [A]gency authority under direct-deal term contracts extends only to the placement of print orders and to the transmission of copy and proofs. Exceeding this authority, or not meeting the responsibilities prescribed by GPO, may be cause for an agency to lose its direct-deal privilege. All other authority rests with GPO's Contracting Officers. Agency personnel are not allowed to negotiate with contractors or to require performance beyond the terms of the contract.

Defendant maintains that plaintiff was aware of this provision, although it was not incorporated directly into the contract. Plaintiff disputes this allegation.

5. "Snap sets" are forms that require perforations for detachment from the top or side binding stub. It is edge glued. If the top or side perforated strip is torn, the forms are released.

6. "Marginally-punched continuous forms" are forms manufactured from a continuous roll of paper that is not cut into units or sets. This type of product contains small holes punched into the margins of the paper which are used to propel the continuous forms through an automatic feed computer printer. Defendant takes the position that Program C384–S was not intended for marginally-punched continuous forms because multiple-part carbonless paper sets are a different manufacturing specialty than marginally-punched continuous forms.

prior print orders had been requested mistakenly and issued in error, although the mistake was not discovered because the orders were for comparatively small quantities.

After review of the finished products and the contract, Mr. Scott concluded that the products specified by Print Orders 80163 and 80164 fell outside the scope of the contract. By letter dated April 13, 1994, Mr. Scott advised plaintiff that its failure to address this discrepancy with the GPO constituted "an unauthorized contractual action." He calculated the fair market value of the products by applying the line-item prices from plaintiff's bid for Program A 1026–M, a general usage contract devoted exclusively to the procurement of marginally-punched continuous forms, to the products under Print Orders 80163 and 80164. Mr. Scott determined that GPO would have purchased the products in Print Order 80163 for $8,436.51 and Print Order 80164 for $5,380.96 had NIH issued a purchase order under Program A1026–M.

On May 13, 1994, Mr. Scott issued his Notice of Final Decision. He reasoned that although "[t]he print orders conformed to the contract specifications," the attached specification sheets, calling for 9½ × 11″ marginally-punched continuous forms, crimp joined, file punched and perforated ½″ left and right, with a horizontal tearline perforation every 11″, were items "clearly out of the scope of the contract specifications." The decision explained that plaintiff produced the print orders without notifying the GPO of the discrepancies among the contract specifications, the print orders, and the attached specification sheets. For these reasons, *inter alia,* Mr. Scott informed plaintiff that it was his "intention to immediately begin to recover the estimated overpayment amount of $114,548.14 ($80,132.75 from Print Order 80163 and $34,415.39 from Print Order 80164)" from plaintiff's account.

Plaintiff filed its appeal with the GPOBCA on September 30, 1994. Following a hearing, the GPOBCA issued an opinion sustaining the contracting officer's final decision. *See United Computer Supplies, Joint Venture,* GPOBCA 26–94 (Jan. 23, 1998). The board concluded that the contract, when read in its entirety, was not ambiguous as to its scope;

that the scope did not encompass marginally-punched continuous forms; that plaintiff had not sustained its burden of proof with regard to estoppel; and that the GPO established its entitlement to recoup $114,548.30 from plaintiff. *See id.,* slip op. at 15, 17–18. Plaintiff thereafter filed its complaint in the Court of Federal Claims seeking to recover the amount awarded to the GPO, plus interest and attorneys' fees. Defendant counterclaimed for the recovery of the overpayments.

## DISCUSSION

In reviewing the GPOBCA's decision under the Wunderlich Act, the court "may not take new evidence or redetermine the facts, and limits its review to the record developed before the agency." *Titan Pac. Constr. Corp. v. United States,* 17 Cl.Ct. 630, 632 (1989), *aff'd* 899 F.2d 1227 (Fed.Cir.1990) (Table). A factual finding of an agency board of contract appeals shall be upheld unless it is "fraudulant or capricious or arbitrary or so grossly erroneous as to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321. "Where two equally reasonable but contrary inferences might be drawn from the record, and each could be sustained as supported by substantial evidence, the one adopted by the Board should be sustained." *Gulf Contracting, Inc. v. United States,* 23 Cl.Ct. 525, 528 (1991) (citing *Titan Pac. Constr.,* 17 Cl.Ct. at 634–635 (1989)). Unless the court first concludes that no substantial evidence supports the board's findings, it should not "decide an issue of fact not decided by the Board, or contrary to the finding made by the Board." *Gulf Contracting, Inc.,* 23 Cl.Ct. at 528. Although conclusions of law are not binding, the board's interpretation of a contract is accorded considerable deference and respect. *See Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985); *George Hyman Constr. Co. v. United States,* 215 Ct.Cl. 70, 80, 564 F.2d 939, 944 (1977).

Plaintiff advances several theories to support its argument that the scope of the contract encompasses the forms identified in Print Orders 80163 and 80164. Plaintiff first contends that the contract extends to mar-

ginally-punched "multiple-part carbonless paper sets" with "vertical and/or horizontal perforation," and that "[c]omplete instructions will be indicated on the print order." Because it is undisputed that the products ordered and produced under Print Orders 80163 and 80164 are "multiple-part carbonless paper sets," and because no language in the specifications excludes "continuous" sets, plaintiff reasons that the marginally-punched multiple-part carbonless paper sets produced under the subject print orders fall unambiguously within the scope of contract's language.

Plaintiff next argues that defendant's interpretation of the contract language describing "multiple-part carbonless paper sets, fan apart or equal, and/or pads ... requiring such operations ... as perforations," is unduly restrictive. Defendant reads this language such that "fan apart or equal" modifies "multiple-part carbonless paper sets." In plaintiff's view the "SCOPE" clause of the contract contemplates three distinct products: (1) "multiple-part carbonless paper sets," (2) "fan apart or equal," and (3) "pads." Thus, following plaintiff's logic, "fan apart or equal" is a separate type of product that allows for the bonding method required by Form Nos. 2555 and 2556.

Regarding the remaining inconsistencies that the board discussed between the contract specifications and Print Orders 80163 and 80164, plaintiff asserts that none of these alleged inconsistencies removes the marginally-punched multiple-part carbonless paper sets it produced from the contract's scope. According to plaintiff, (1) because the contract states that additional instructions would be provided on individual print orders, and Print Orders 80163 and 80164 contained an attachment allowing crimping as an alternative to gluing, the contract language addressing "[j]oining" permitted crimping as an acceptable alternative to gluing; (2) because the contract provides for "an occasional order with either vertical and/or horizontal perforation," plaintiff's product under Print Orders 80163 and 80164 should not be excluded on the ground that it contained perforations;

and, finally, (3) "there is no basis in the contract for the Board's conclusion that the maximum trim size of 8½ × 11" refers to the overall size of a form with a stub or stubs which are intended to be detached by the user to create the final product," Plf's Br. filed Aug. 31, 1998, at 12, because it is the final or detached trim size that accurately describes the product.

In addition to its arguments based on the contract language, plaintiff notes that, in prior years, NIH has accepted "snap sets," which are comparable to the marginally-punched, multiple-part continuous forms that the GPO now rejects, under Program C384–S. These snap sets, like the marginally-punched multiple-part continuous forms, were not bound by edge glue, as the contract specified. Plaintiff points out that NIH ordered and paid for these snap sets numerous times under Program C384–S, constituting a course of dealing between plaintiff and NIH that should compel acceptance of the products currently at issue.

Defendant rejoins that Program C384–S excludes these forms. First, defendant observes that the contract specifically calls for the sets to be joined by "edge bonding" using a special adhesive, but the forms at issue were joined by crimping. Second, the forms exceeded the maximum trim size specified in the contract. Defendant's definition of trim size is based on the form's size after excess paper, required in production, is trimmed off, but before the ½" stubs typically torn off by the end user are removed.[7] Third, the contract permits ¼" or ⅜" holes to be drilled on either the top or left of the form, but the print orders at issue called for multiple holes smaller than a ¼" along both the left and right margins of the form. Finally, defendant asserts that the contract provides an estimate of 100 perforations for its entire term, but Print Orders 80163 and 80164 far exceeded this estimate.

To the extent that plaintiff relies on a prior course of dealing between the parties in

---

7. For instance, an 8½ × 11" form, prior to the removal of both side strips bordering the left and right sides of the form, will measure 9½ × 11". Defendant interprets trim size to refer to the form as it measures 9½ × 11", presumably its size after the producer of the form has removed any excess paper associated with its manufacture.

which similar products were requested and accepted under Program C384–S, defendant insists that, because the NIH specialist lacked authority to change the terms of the contract, NIH's previous erroneous acceptance of similar products should not permit plaintiff to benefit once this error was recognized. Defendant also notes that the GPO contracting officer, in whom actual authority for Program C384–S was vested, had no knowledge of these prior orders.

■ Although it may appear oxymoronic to invoke the concept of plain meaning for a contract addressing a panoply of terms and measurements, the court must look to the plain meaning of the contract in order to determine whether Program C384–S includes or excludes the print orders at issue. *See Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998); *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993). When the contract language is unambiguous, the court's inquiry is at an end and the plain language of the contract is controlling. *See Textron Defense Sys.,* 143 F.3d at 1469. A contract term is unambiguous when there is only one reasonable interpretation. *See Triax Pac., Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir.1998); *A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994); *see also Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) (noting that contract is ambiguous where two reasonable interpretations are consistent with contract language). The contract must be considered as a whole and interpreted to " 'effectuate its spirit and purpose' " giving " 'reasonable meaning to all parts.' " *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)); *see Fortec Constructors,* 760 F.2d at 1292. Such construction " 'will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *Gould, Inc.,* 935 F.2d at 1274 (quoting *Arizona,* 216 Ct.Cl. at 235–36, 575 F.2d at 863); *see Fortec Constructors,* 760 F.2d at 1292.

■ The contract under Program C384–S is unambiguous because only one interpretation is consistent with the contract language. Plaintiff is correct insofar as the contract allows for the holes and perforations in Print Orders 80163 and 80164, and further states that complete instructions regarding drilling and perforations will be indicated on the print orders. Plaintiff is also correct that the contract is silent as to the precise meaning of "trim size," leaving room for plaintiff's definition. Nonetheless, plaintiff's interpretation of the contract ultimately fails because it renders a portion of the contract meaningless.

Plaintiff's interpretation of "binding" cannot be reconciled with the language outlining the contract's scope. This portion of the contract states, in pertinent part:

BINDING:

Multiple-part sets shall be collated, trimmed to size, and joined into sets by "edge bonding" using a special adhesive made for this purpose, that will hold the individual parts of a set together during fill-in and normal handling, but which allows ready separation of the parts without damage to the parts. Parts shall be joined into sets at the edge specified on the individual print orders.

Plaintiff contends that the contract language, "[p]arts shall be joined into sets at the edge specified on the individual print orders," permits the use of a bonding type specified in the print order, even if the type specified in the print order contradicts the terms of the contract. Plaintiff reaches this conclusion by ignoring three words in the middle of the sentence and by doing violence to the fundamentals of grammar and sentence construction. Plaintiff's preferred reading is "Parts shall be joined into sets ... specified on the individual print orders." The additional instructions that one might expect to find "specified on the print order" refer to the particular "edge,"—top, bottom, left, or right—on which the sets are bonded—not the manner by which the "parts shall be joined." Moreover, plaintiff's interpretation ignores the language in the contract stating explicitly that the sets would be joined by "edge bonding." The products described by

Print Orders 80163 and 80164 called for binding by crimping. The pertinent contract language does not state that the sets "may"— but, instead, "shall"—be joined using a special adhesive. No provision in the contract permits the agency to ignore or modify this requirement. Therefore, plaintiff cannot contend reasonably that its products that were joined by crimping fall within the scope of the binding provision and are thus in accord with the scope of the contract.

Plaintiff next argues that the phrase "fan apart or equal" stands independent of, and does not modify, "multiple-part carbonless paper sets." The subsection of the contract entitled, "SCOPE" reads, in its entirety:

> SCOPE: These specifications cover the production of multiple-part carbonless paper sets, fan apart or equal, and/or pads requiring such operation as film making, composition, printing, cutting, drilling, perforating, numbering, padding, packing and delivery.

Plaintiff's urging that "fan apart or equal" constitutes a separate product, distinct from "multiple-part carbonless paper sets," is not reasonable, particularly in light of the contract specifications addressing binding. The provision of the contract contemplating binding specifies that the multiple-part sets are joined by " 'edge bonding' using a special adhesive made for that purpose." If "fan apart or equal" were interpreted to suggest that the marginally-punched, multiple-part continuous forms produced by plaintiff were compliant, the contract's binding specifications would be rendered wholly inapplicable, because multiple-part continuous forms typically are not joined by an adhesive bond. The binding provision neither states that crimping is an acceptable means of binding each set, nor permits the substitution of an alternative binding method—by print order or otherwise—for the "special adhesive" specified in the contact. Reasonably interpreted, "fan apart or equal" operates as an adjectival phrase restricting "multiple-part carbonless paper sets." Because plaintiff's interpretation neither affords meaning to each of the contract provisions, nor reconciles the contract as a whole, it cannot be consid-

ered reasonable. *See Gould, Inc.,* 935 F.2d at 1274.

The GPOBCA determined that the term "trim size" was not defined in the contract. *United Computer,* GPOBCA 26–94, slip op. at 12. After consulting *Webster's Third New International Dictionary* (1971), which defines trim size as "the actual size of something (as a magazine or book or page) after excess material required in production has been cut off," the board agreed with the GPO that the trim size includes not just the forms themselves, but also the removable tabs, stubs, or side strips that enable the agency to use the forms. *See United Computer,* slip op. at 14.

The contract specification addressing trim size does not provide a definition:

> TRIM SIZES: Various trim sizes will be ordered and paid for in their respective "Format" classification as follows:
>
> Format "A": 3 x 5″ up to and including 4 x 6″.
>
> Format "B": Over 4 x 6″ up to and including 8–½ x 11″

■ However, the mere fact that the parties disagree with regard to the interpretation of a specific contract provision does not, in and of itself, render the provision ambiguous. *See Community Heating & Plumbing,* 987 F.2d at 1579; *Brunswick Corp. v. United States,* 951 F.2d 334, 337 (Fed.Cir.1991). Although plaintiff's interpretation of trim size is reasonable, *i.e.,* that trim size refers to the size of the forms after removal of any post-production excess paper, as well as the aforementioned tabs, stubs, or side strips, defendant's contention that the print orders are outside the scope of the contract is still valid. Plaintiff cannot rely on the reasonableness of its interpretation with respect to this particular clause to overcome the extent to which the forms it submitted on Print Orders 80163 and 80164 remain beyond the scope of the contract, *e.g.,* with respect to binding.

■ Even if the products requested by Print Orders 80163 and 80164 do not fall within the scope of the contract, plaintiff relies on the parties' prior course of dealings to render the subject forms compliant. "[A] course of dealing can supply an enforceable

term to a contract, or even may even supplement or qualify that contract, provided the conduct which identifies the course of dealing can reasonably be construed as indicative of the parties' intentions—a reflection of their joint or common understanding." *Sperry Flight Sys. Div. of Sperry Rand Corp. v. United States*, 212 Ct.Cl. 329, 342, 548 F.2d 915, 923 (1977). In determining whether the parties' conduct reflects a joint or common understanding, *Gresham & Co. v. United States*, 200 Ct.Cl. 97, 470 F.2d 542 (1972), is instructive:

> "When a party with knowledge or the means of knowledge of his rights and of the material facts does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation or permits the other party to deal with the subject matter under the belief that the transaction has been recognized, or abstains for a considerable length of time from impeaching it, so that the other is reasonably induced to supposed that it is recognized, there is acquiescence...."

200 Ct.Cl. at 119, 470 F.2d at 554–55 (quoting *Harvey Radio Labs., Inc. v. United States*, 126 Ct.Cl. 383, 391–92, 115 F.Supp. 444, 449 (1953), *cert. denied*, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954)).

During argument plaintiff directed the court's attention to a snap set that NIH requested and accepted on a prior print order issued under Program C384–S. Although these snap sets, like the marginally-punched multiple-set continuous forms, were not bound by edge glue, they were ordered and paid for numerous times. Relying on *Gresham* and *Miller Elevator Co. v. United States*, 30 Fed.Cl. 662 (1994), plaintiff argues that this conduct was sufficient to establish a course of dealing.

In *Gresham* the court determined that the Government's acts led the contractor to believe that a contract specification had been suspended or, in effect, waived, until further notice. "There can be no doubt that a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believed the requirement to be dead." *Gresham*, 470 F.2d at 554. Although the court rested its decision, in part, on the Government's acceptance of a nonconforming product, the course of dealing between the parties in *Gresham* indicated more convincingly than the conduct in the instant matter that a contract provision had been waived. Moreover, the court recognized that "[t]he waiver of a contract provision requires a decision by a responsible officer assigned the function of overseeing the essentials of contract performance, not just any Federal employee connected with the contract." *Id.* at 555.

The prior course of dealing in *Miller Elevator* allowed for substantial work done beyond the scope of the contract. The court considered significant the consistent frequency with which the work was requested and approval of the additional work by the assistant field office manager to whom authority had been delegated. Based on the oral instruction properly authorizing this work, despite its absence from the express terms of the contract, the court found that defendant waived certain contract requirements, the result of an established course of dealing. *See Miller Elevator*, 30 Fed.Cl. at 693–94.

Establishing a course of dealing requires a reflection of a joint or common basis of understanding held by both parties. *See Sperry Flight Sys.*, 212 Ct.Cl. at 342, 548 F.2d at 923–24. Plaintiff's reliance on NIH's unauthorized conduct in support of its argument that such an understanding existed between plaintiff and the GPO does not meet this standard. Unlike the contractor in *Gresham*, the facts here are not such that the contracting officer "knew or should have known," that plaintiff was manufacturing products in violation of contract requirements. *Gresham*, 200 Ct.Cl. at 120, 470 F.2d at 555–56; *see Miller Elevator*, 30 Fed.Cl. at 689–90. *Gresham* also requires an officer who is assigned the function of overseeing the essentials of contract performance, not just any federal employee or officer whose work happens to be connected with the contract, to waive such provision.

The express terms of the subject contract, reinforced by the language in the award letter, dated December 3, 1992, which states, "representatives of the ordering agency do

not have the authority to alter or change the specifications, contract terms or the print orders once issued," demonstrate that the NIH contract specialist was not authorized to request and receive products outside the scope of the contract under which the print orders were issued. Nothing in the record suggests that GPO had the knowledge or the means of knowledge that NIH's prior requests were beyond the scope of the subject contract, which further underscores that no course of dealing existed.[8]

The court is mindful that this is one of those cases where government employees— NIH's contracting personnel—hide behind the skirts of an ironclad argument that they lacked authority to issue a print order beyond the scope of the GPO contract. As plaintiff observed, were the roles reversed in this fixed-price contract dispute, and the Government profited handsomely from an ill-considered contractor bid, the contractor would be unable to recover its losses. Although the equities lie on plaintiff's side, and the GPO in these circumstances could well have offered plaintiff some accommodation, the larger point remains that the controlling principles of contract law that the court has applied protect the fisc and allow for predictability in result. Regrettably, they do not address the competence of the contract personnel who precipitated plaintiff's difficulties.

The record fully supports the GPOBCA's decision under the Wunderlich Act standard of review.

## CONCLUSION

Accordingly, based on the foregoing, plaintiff's motion for judgment on the administrative record is denied, and defendant's cross-motion and motion for judgment on its counterclaim are granted. The Clerk of the Court shall enter judgment for defendant in the amount of $114,548.30.

**IT IS SO ORDERED.**

No costs.

---

8. Plaintiff's estoppel argument fails because it has not established that the contracting officer at the GPO had actual knowledge that NIH had issued print orders requesting products beyond the scope of the governing contract. *See* Plf's Br. filed Aug. 31, 1998, at 22–26.