*1087 TEXTO COMPLETO DE LA SENTENCIA
Comparecen ante nos MAPFRE Life Insurance Company (MAPFRE), American Health Inc. (AHI), Golden Cross Health Plan, Corp. (Golden Cross) y Global Health Plan and Insurance Co. (Global) (en conjunto las recurrentes) mediante recursos consolidados de revisión administrativa. Nos solicitan que revoquemos los Avisos de Adjudicación original y enmendado y el Aviso de Certificación (el Aviso) emitidos por el Departamento de Hacienda (el Departamento o el recurrido) por medio de los cuales certificó las compañías aseguradoras que estarían autorizadas a contratar beneficios médico-quirúrgicos, dentales, de hospitalización y medicinas con los empleados y pensionados del Estado Libre Asociado de Puerto Rico (ELA), al tenor de la Ley Núm. 95 de 29 de junio de 1963, según enmendada, Ley de Beneficios de Salud para Empleados Públicos (Ley Núm. 95), el correspondiente Reglamento y ciertas Cartas Circulares. En virtud de dicho Aviso, el Departamento también excluyó a las recurrentes de tal certificación.
Conjuntamente con su recurso, la recurrente MAPFRE presentó Moción en Auxilio de Jurisdicción en la que nos solicitó: (1) que paralizáramos el procedimiento de contratación aludido y la autorización para hacer campañas de ventas a las aseguradoras favorecidas; (2) que prorrogáramos el término para que los beneficiarios hicieran la selección del plan, mediante la extensión de los contratos vigentes hasta que resolvamos el recurso; y (3) que la certificáramos para contratar y promocionar y vender su producto en igualdad de condiciones que las demás aseguradoras autorizadas. [1]
Analizados tanto las Mociones en Auxilio de Jurisdicción presentadas por las recurrentes, como los recursos aludidos, resolvemos denegar las primeras y confirmar el Aviso recurrido.
I
El 26 de agosto de 2009, el Secretario de Hacienda, Hon. Juan C. Puig Morales (el Secretario) emitió la Carta Circular núm. 01-2009 dirigida a aseguradoras y entidades similares (en conjunto aseguradoras) en las que les informó que estaría recibiendo propuestas para proveer beneficios médico-quirúrgicos, dentales, de hospitalización y medicinas (en conjunto seguro de salud) para los empleados activos y pensionados del ELA.
En la referida carta, el Departamento detalló los requisitos de la cubierta uniforme y beneficios al igual que los documentos y las condiciones que cada aseguradora interesada debía proveer con sus propuestas, todo ello acorde con la Ley Núm. 95, supra, y el Reglamento sobre Planes de Beneficios de Salud para Empleados Públicos de 10 de junio de 1983 (Reglamento 2994).
El 11 de septiembre de 2009, el Departamento celebró una reunión con las aseguradoras en la que se discutieron varios aspectos relativos a las propuestas. Mediante una comunicación escrita fechada 25 de septiembre de 2009, el Departamento aclaró las diversas interrogantes planteadas por las aseguradoras en dicha reunión.
El 30 de septiembre de 2009, el Secretario emitió la Carta Circular núm. 2009-10 a los fines de enmendar la *1088 Carta Circular 2009-01 en ciertos aspectos que no resultan ser medulares a los recursos.
Oportunamente, las recurrentes presentaron sus respectivas propuestas. Como resultado del proceso de evaluación de las propuestas sometidas por las aseguradoras, el Secretario emitió el 16 de noviembre de 2009 la Carta Circular núm. 2009-11, en la que, entre otros, concluyó que conforme a la evaluación del Comité Asesor y la Oficina del Comisionado de Seguros las tarifas sometidas por las proponentes eran “... excesivas e inasequibles al bolsillo de los empleados públicos o que no salvaguardaban sus mejores intereses”. [2] Por ende, el Departamento determinó extender la fecha de efectividad de los contratos de beneficios médicos existentes hasta el 28 de febrero de 2010, por lo que la vigencia de las nuevas contrataciones comenzaría el 1ro de marzo de 2010.
Durante este proceso, el Departamento hizo entrega de la Cubierta Uniforme Modificada a las aseguradoras de los planes comerciales, entre ellos Golden Cross y Global. El 3 de diciembre de 2009, el Departamento emitió la Carta Circular núm. 2009-13 en la que dispuso que “[e]n relación a la Cubierta Advantage y Medicare con farmacia parte D, la renovación será automática hasta el 31 de diciembre de 2010. La cubierta complementaria de Medicinas se extenderá hasta el 28 de febrero de 2010. A partir de marzo, los pensionados con cubierta complementaria deben haber realizado los trámites pertinentes para renovar su complementaria a través de las compañías que el Departamento haya seleccionado para la contratación 2010. El pensionado que decida no renovar con su plan tendrá hasta el 7 de febrero de 2010 para cambiar de compañía.” [3]
De otro lado, el 23 de diciembre de 2009, MAPFRE y el Secretario suscribieron una Extensión a Contrato para la Prestación de Beneficios Médico-Quirúrgicos, Dentales, Medicinas y de Hospitalización Para Empleados y Pensionados del Estado Libre Asociado de Puerto Rico de conformidad con la Carta Circular 2009-11. En esencia, las partes acordaron prorrogar la vigencia del contrato hasta el 28 de febrero de 2010 y, por ende, enmendar la cláusula 39 del mismo de la siguiente manera:
“39. El período de vigencia de este contrato será por el siguiente término: las nuevas tarifas y cubiertas tendrán efectividad el 1ro de enero de 2009 hasta el 28 de febrero de 2010. La cubierta Advantage y Medicare con farmacia D se renovará automáticamente hasta el 31 de diciembre de 2010. La cubierta complementaria de Medicare se extenderá hasta el 28 de febrero de 2010.” [4]
Así las cosas, el 28 de diciembre de 2009 se celebró la reunión oficial del Comité Asesor de Planes Médicos (el Comité Asesor) en la que estuvieron presentes entre otros, el Secretario, el Comisionado de Seguros, Sr. Ramón Cruz, la Sra. Arlene L. Alsina Santiago, representante de la Oficina de Recursos Humanos del ELA (ORHELA) y la Sra. Magalis Marcón Pérez, representante del Departamento de Salud. Según surge de la Minuta de dicha reunión, el Comité Asesor votó por los planes que estarían autorizados para contratar seguros de salud con los empleados y pensionados del ELA. De este modo, aprobó nueve (9) planes [5] y excluyó a cuatro (4). [6] Se indicó además en la Minuta que la exclusión de MAPFRE se debió a la poca cantidad de sus suscriptores y que no ofrecía tantos beneficios en comparación con las demás compañías. Con relación a AHI se expresó que se excluía por cierta información del Comisionado de Seguros en cuanto a su situación financiera. Respecto a Golden Cross, el Comité Asesor indicó que la cantidad de suscriptores era mínima dentro de la cubierta actual. Por último, referente a Global, esbozó que el impacto económico sería mínimo porque no tiene contrato activo con el Gobierno y que hizo una representación a una agencia gubernamental sin estar certificadas y en 2008-2009 contrató con algunos municipios sin estar certificadas por el Secretario. [7]
El mismo 28 de diciembre de 2009, el Departamento emitió Aviso de Adjudicación dirigido a las recurrentes y depositó el correspondiente a MAPFRE el 31 de diciembre de 2009. [8] Por no estar de acuerdo con la decisión del Departamento, el 12 de enero de 2009, MAPFRE presentó una Moción de Reconsideración, la que suplemento el 21 de enero de 2009. Surge del Apéndice que previo a presentar la aludida Moción de Reconsideración, el 8 de enero de 2010, la recurrente solicitó al Departamento el acceso al expediente *1089 administrativo. [9] Luego de un intercambio de cartas, el Departamento le proveyó acceso a la Minuta de la Reunión Oficial del Comité Asesor de Planes Médicos (la Minuta) y el Informe de Hallazgos Documentos Administrativos Planes Médicos Contratación 2010.
Inconforme aún, el 27 de enero de 2010, MAPFRE presentó el recurso de revisión administrativa de epígrafe en el que le imputó al Departamento haber cometido los siguientes errores:
“A. ERRÓ EL DEPARTAMENTO DE HACIENDA AL NO FUNDAMENTAR SU DECISIÓN DE CERTIFICAR A CIERTAS ENTIDADES PROPONENTES SOBRE OTRAS Y AL EMITIR UN AVISO DE ADJUDICACIÓN — PARA LAS PROPONENTES NO BENEFICIADAS — EN EL QUE NO SE LES ADVIERTE SOBRE SU DERECHO A SOLICITAR RECONSIDERACIÓN ANTE LA AGENCIA Y REVISIÓN ANTE ESTE HONORABLE TRIBUNAL.
B. ERRÓ EL DEPARTAMENTO DE HACIENDA AL INCUMPLIR EL TEXTO DE SU PROPIO REGLAMENTO 2994 AL SUPUESTAMENTE REALIZAR UN PROCESO DE NEGOCIACIÓN NO CONTEMPLADO.
C. ERRÓ EL DEPARTAMENTO DE HACIENDA AL INCUMPLIR EL TEXTO DE SU PROPIO REGLAMENTO 2994 DEBIDO A LA FALTA DE GRABACIÓN DE LOS PROCEDIMIENTOS, NO RENDIR EL INFORME REQUERIDO Y LA FALTA DE QUORUM EN LA REUNIÓN DEL COMITÉ ASESOR.
D. ERRÓ EL DEPARTAMENTO DE HACIENDA AL EXCLUIR ARBITRARIAMENTE A MAPFRE DE LAS ENTIDADES QUE PUEDEN CONTRATAR BAJO LA LEY 95 POR RAZONES AJENAS A LO REQUERIDO EN LA LEY 95, EL REGLAMENTO 2994 Y LAS CARTAS CIRCULARES APLICABLES, Y A PESAR DE ÉSTA CUMPLIR CABALMENTE CON TODOS LOS REQUISITOS DISPUESTOS EN ESTAS FUENTES.
E. ERRÓ EL DEPARTAMENTO DE HACIENDA AL EXCLUIR A MAPFRE DE LA CERTIFICACIÓN PARA LA CONTRATACIÓN CON LOS EMPLEADOS UNIONADOS DEL ELA, A PESAR DE QUE ÉSTOS NEGOCIAN DIRECTAMENTE LOS SEGUROS DE SALUD, EN SU CAPACIDAD DE ENTIDADES PRIVADAS.
F. ERRÓ EL DEPARTAMENTO DE HACIENDA AL REQUERIRLE A MAPFRE LA RENOVACIÓN DE LA CUBIERTA MEDICARE, PARA LUEGO EXCLUIRIA] DE LA CERTIFICACIÓN PARA LA CONTRATACIÓN BAJO LA LEY 95.
G. ERRÓ EL DEPARTAMENTO DE HACIENDA AL DENEGARLE ACCESO A MAPFRE A LA TOTALIDAD DEL EXPEDIENTE ADMINISTRATIVO.”
En igual fecha, MAPFRE presentó Moción en Auxilio de Jurisdicción en la que, en esencia, solicitó la paralización de los efectos del Aviso de Adjudicación.
Atendido el recurso y la aludida Moción, en Resolución de 27 de enero de 2010 concedimos al recurrido un plazo a vencer el 29 de enero de 2010 a las 12M. para que, acorde con la Regla 83.1 de nuestro Reglamento, emitiera un Aviso de Adjudicación enmendado, ya que los originales carecían de los fundamentos mínimos necesarios para que pudiéramos ejercer nuestra función revisora. Además, concedimos al Departamento y demás partes con interés hasta el 1ro de febrero de 2010 para que presentaran sus respectivos alegatos y se expresaran respecto a la Moción en Auxilio de Jurisdicción.
*1090 Oportunamente, el 29 de enero de 2010, el Departamento presentó Moción en Cumplimiento de Resolución y Solicitando Término Adicional. Así, proveyó al Panel un Aviso de Certificación fechado 29 de enero de 2010 en el que esbozó, entre otros asuntos, que el rechazo de MAPFRE del proceso de contratación se debió a que “[l]a cubierta de beneficios de la aseguradora MAPFRE es más limitada que las demás cubiertas Advantage presentadas”. También se esbozó que la exclusión de AHI se debió a “[información provista por el Comisionado de Seguros en cuanto a su situación financiera”, la de Golden Cross a que “... [é]sta no tiene la capacidad administrativa para atender a m[á]s de 35,000 suscriptores....” y con relación a Global que “... ha estado en incumplimiento con la Ley Núm. 95 y Cartas Circulares...,” [10] También el Departamento nos pidió una prórroga hasta el 5 de febrero de 2010 para presentar su alegato dada la importancia y complejidad del recurso.
El mismo 29 de enero de 2010, emitimos Resolución en la que determinamos que el Aviso de Certificación así sometido tampoco contenía los fundamentos suficientes para ejercer adecuadamente nuestra función revisora. Por ende, concedimos al recurrido hasta el 1ro de febrero de 2010 a las 12 del mediodía para enmendarlo. Asimismo, concedimos al Departamento y a las partes con interés hasta el miércoles 3 de febrero de 2010 para presentar sus alegatos respectivos y se expresaran respecto al auxilio de jurisdicción solicitado. Por otro lado, otorgamos igual plazo a MAPFRE para que fijara su posición sobre el Aviso de Certificación enmendado a ser presentado por el Departamento. Por último, justificamos el trámite acelerado así dispuesto en razón del significativo interés público que reviste la controversia.
Por su parte, AHI presentó Escrito de American Health Inc. en Cumplimiento de Orden de 27 de enero de 2010 y Alegato en Apoyo a Solicitud de Revisión de Decisión Administrativa, y Golden Cross presentó Alegato Presentado Por (sic) de Golden Cross Health Plan Corp. en Cumplimiento de la Orden de 27 de enero de 2010 y en Apoyo a la Solicitud de Revisión de Decisión Administrativa Presentada Por MAPFRE Life Insurance Company el 1ro de 2010. En ambos escritos, éstas hicieron señalamientos de error similares a los alegados por MAPFRE en su recurso. Por su parte, Global presentó Alegato de Global Health Plan and Insurance Co. [11]
Atendidos tales escritos, determinamos que constituían propiamente recursos de revisión administrativa, por lo que ordenamos el desglose de éstos; que la Secretaría les asignara un nuevo número, y los refiriera a este Panel para ser consolidados con el recurso originalmente presentado por MAPFRE.
Así las cosas, el 2 de febrero de 2010, el Departamento presentó el Aviso de Certificación solicitado en el que aclaró los pormenores del proceso de evaluación de propuestas. Así, el Departamento explicó que el “... proceso [de negociación] se limitó a las aseguradoras que presentaron propuestas de cubierta comercial para los empleados, no se entró a negociar con las compañías interesadas en la certificación únicamente para la cubierta de Medicare Advantage para los pensionados ...”. [12] Respecto a MAPFRE, el Aviso expresó como razón para no autorizarla a contratar lo siguiente:
“MAPFRE - Según se informó en reuniones con las compañías participantes del proceso, como estrategia para el programa se buscaría reducir el número de compañías certificadas por el Departamento de Hacienda a propósito de propiciar competencia que genere mejores ofertas año tras año. Esta estrategia implica que no se certificaría a todas las proponentes, aun cuando cumplieran con todos los requisitos de la Cubierta Uniforme y otros, y presentaran una cubierta competitiva. En el caso de MAPFRE, esta compañía tiene un limitadísimo número de suscriptores, consistente del 3% de los pensionados (vis-a-vis 20%, 21%, 27% y 28% de los pensionados para las otras compañías certificadas en el área de Medicare Advantage). Este número no representa una masa crítica de suscriptores y evidencia la pobre acogida de su oferta por los aseguradores, factores que fundamentan la negativa de certificarla.” (Énfasis en el original.)
Con relación a AHI, el Aviso señaló que fue excluida por “información provista por el Comisionado de Seguros en cuanto a que su situación financiera hace que la Aseguradora no cumpla el requisito de solvencia *1091 económica”. [13] Sobre Golden Cross expuso que: “[S]egún información provista por la propia aseguradora, ésta no tiene la capacidad administrativa para atender a m[á]s de 35,000 suscriptores, razón por la cual el Comité Asesor no recomendó a la Aseguradora”. [14] Por último, referente a Global indicó que:
“Global Health- La Aseguradora ha estado en incumplimiento con la Ley 95 en cuanto a que se requiere estar certificada por el Secretario de Hacienda para poder anunciarse y vender su producto al Gobierno. La aseguradora ha estado vendiendo y sigue vendiendo su cubierta de beneficios a los municipios de, por ejemplo, Barceloneta, Arecibo y Florida. Por tanto, no cumple con los requisitos para obtener la certificación. Según la Carta Circular 01-2009, para que las proponentes puedan ser certificadas tienen que estar en cumplimiento con la Ley 95 y las cartas circulares emitidas a esos efectos por el Secretario de Hacienda.”
Posteriormente, el 3 de febrero de 2010 varias de las partes interesadas presentaron sus respectivos alegatos relativos a los recursos de autos y a la solicitud en auxilio de jurisdicción.
Con el beneficio del análisis riguroso de las comparecencias escritas de las partes, procedemos a resolver.
n
Es norma establecida que a toda determinación administrativa le cobija una presunción de regularidad y corrección. La revisión judicial de este tipo de decisiones se circunscribe a determinar si la actuación de la agencia es arbitraria, ilegal, o tan irrazonable que la misma constituye un abuso de discreción. Otero v. Toyota, 163 D.P.R. 716 (2005); Mun. de San Juan v. J.C.A., 149 D.P.R. 263 (1999).
La presunción de corrección que tiene una decisión administrativa debe sostenerse por los tribunales a menos que la misma logre ser derrotada mediante la identificación de prueba en contrario que obre en el expediente administrativo. Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194 (1989); Murphy Bernabe v. Tribunal Superior, 103 D.P.R. 692 (1975). Lo anterior obedece a que los tribunales deben dar deferencia a las determinaciones de las agencias sobre asuntos que se encuentren dentro del área de especialidad de éstas. Rivera Concepción v. A.R.P.E., 152 D.P.R. 116 (2000).
Al evaluar un recurso de revisión judicial de una determinación administrativa, el tribunal analizará, conforme al expediente administrativo, si: (1) el remedio concedido fue razonable; (2) las determinaciones de hechos están razonablemente sostenidas por la prueba; y (3) las conclusiones de derecho son correctas. T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70 (1999); Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998); D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da Ed., Bogotá, Forum, 2001, pág. 534.
La función revisora del tribunal, aunque restringida, tiene como propósito fundamental delimitar la discreción de los organismos administrativos y velar porque sus actuaciones sean conformes a la ley y estén dentro del marco del poder delegado. Misión Ind. P.R. v. J.P., supra.
Este ejercicio por parte del tribunal está enmarcado en dos principios fundamentales que postula la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A. see. 2101 y ss. “Las determinaciones de hechos de las decisiones de las agencias serán sostenidas .por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo.” See. 4.5 de la LPAU, 3 L.P.R.A. see. 2175. Sin embargo, “[l]as conclusiones de derecho serán revisadas en todos sus aspectos por el tribunal.” Id.
El criterio rector en la revisión judicial de una determinación de hechos de una agencia es la existencia de evidencia sustancial. A estos fines, se ha definido evidencia sustancial como “aquella evidencia pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión.” Ramírez v. Depto. de Salud, *1092 147 D.P.R. 901 (1999). De ordinario, los tribunales no intervendrán en las determinaciones de hechos de las agencias, mientras exista evidencia sustancial en apoyo de las mismas. Pacheco v. Estancias de Yauco, 160 D.P.R. 409 (2003). Dicho análisis requiere que la evidencia sea considerada en su totalidad; esto es, tanto la que sostenga la decisión administrativa como la que menoscabe el peso que la agencia le haya conferido. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425 (1997). Esta norma persigue evitar que los tribunales sustituyan el criterio de la agencia en asuntos enmarcados en su destreza y especialización por el criterio del tribunal revisor.
Para sostener la posición de que no existe evidencia sustancial que apoye las determinaciones de la agencia administrativa, la parte afectada debe demostrar que existe “otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [de la agencia] ... no está justificada por una evaluación justa del peso de la prueba.” Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670 (1953). La pmeba ofrecida deberá desfavorecer la presunción de que la determinación del organismo administrativo se desprende de la totalidad de la prueba que éste tuvo ante su consideración. Véase, Ramírez v. Depto. de Salud, supra.
De otra parte, el propósito de exigir que las obras y la contratación que realiza el Gobierno se efectúen mediante el proceso de subasta es proteger los intereses y dineros del Pueblo. Este mecanismo sirve para promover la competencia, lograr los precios más bajos posibles, evita el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos y minimiza los riesgos de incumplimiento. Cordero Vélez v. Mun. Guánica, 170 D.P.R. _ (2007), 2007 J.T.S. 29, a la pág. 862; A.E.E. v. Maxon, 163 D.P.R. 434 (2004); Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864 (1990).
Al igual que otras decisiones administrativas, las resoluciones de las agencias adjudicando subastas se presumen correctas y gozan de deferencia de los tribunales. Accumail v. Junta, 170 D.P.R. _ (2007), 2007 J.T.S. 75; Empresas Toledo v. Junta de Subastas, 168 D.P.R. 771 (2006). Las agencias administrativas en este sentido gozan de una amplia discreción en la evaluación de las propuestas de los licitadores. Debido a su vasta experiencia y especialización, éstas se encuentran en mejor posición que los tribunales para determinar el mejor postor considerando los factores establecidos en la ley y el reglamento. Accumail v. Junta, supra; Empresas Toledo v. Junta, supra.
En la revisión judicial de la adjudicación de una subasta, el tribunal no debe sustituir el criterio de la agencia y debe dar deferencia a las determinaciones de hechos que ésta hace, al igual que a su interpretación de las leyes y reglamentos, siempre que sean razonables. Accumail v. Junta, supra.
Las agencias pueden adjudicar la subasta al postor que consideren más apropiado, aun cuando no sea el más bajo, si con ello se sirve el interés público. En ausencia de fraude, mala fe, o abuso de discreción, ningún participante tiene derecho a quejarse cuando otra propuesta es escogida, ya que ningún postor tiene derechos adquiridos en una subasta. Empresas Toledo v. Junta, supra.
En Puerto Rico no existe legislación especial dirigida a regular los procesos de subasta de las agencias, por lo que éstas tienen la obligación de adoptar reglamentación para guiar dichos procedimientos delimitando el alcance de su discreción. Según lo establece la Sección 3.19 de la LPAU, 3 L.P.R.A. see. 2169, “[I]os procedimientos de adjudicación de subastas serán procedimientos informales; su reglamentación y términos serán establecidos por las agencias.” Conforme lo anterior, cada agencia, como entidad con el conocimiento especializado, tiene discreción para aprobar un reglamento que establezca el procedimiento y las guías a seguir en sus subastas. L.P.C. & D., Inc. v. A.C., 149 D.P.R. 869 (1999).
Por otra parte, se ha establecido que, a pesar del carácter informal sui generis de los procedimientos de subasta, éstos tienen ciertas características adjudicativas, por lo cual la parte adversamente afectada por una *1093 determinación puede ejercer el derecho a solicitar revisión judicial garantizado en la LPAU. Velázquez v. Adm. de Terrenos, 153 D.P.R. 548 (2001). Por lo tanto, es imprescindible que la agencia informe los fundamentos sobre los que descansa su determinación, de modo que el foro judicial pueda ejercer apropiadamente su función revisora. Pta. Arenas Concrete, Inc. v. J. Subastas, 153 D.P.R. 733 (2001).
Según lo anterior, la resolución de la agencia en la cual se notifica la adjudicación de una subasta debe incluir, por lo menos, lo siguiente: (1) los nombres de los licitadores en la subasta y una síntesis de sus propuestas; (2) los factores o criterios que se tomaron en cuenta para adjudicar la subasta; (3) los defectos, si alguno, que tuvieran las propuestas de los licitadores perdidosos; y (4) la disponibilidad y el plazo para solicitar reconsideración y la revisión judicial. L.P.C. & D., Inc. v. A.C., supra.
Ahora bien, aunque la subasta tradicional es el mecanismo más común en la adquisición competitiva de bienes y servicios por el Gobierno, también se ha reconocido la figura del requerimiento de propuestas o “request for proposal” (RFP) como mecanismo informal para tales adquisiciones. Los RFP son procesos, que al igual que las subastas formales, están basados en la competencia, pero son más informales y flexibles. La característica principal del RFP es que permite negociaciones entre los licitadores y el Gobierno durante la evaluación de las propuestas recibidas. Caribbean Communications Solutions y otros v. Policía de Puerto Rico, 176 D.P.R. __ (2009), 2009 J.T.S. 150; R&B Power v. E.L.A., 170 D.P.R. _ (2007), 2007 J.T.S. 56.
El gobierno federal reconoce este tipo de mecanismo informal para ser utilizado por el Gobierno. A tales efectos, la “Federal Acquisition Regulation” (FAR) ha reconocido el “competitive negotiation” como uno de los métodos básicos de contratación del Gobierno. En Puerto Rico, nuestro Tribunal Supremo reconoció la validez de los RFP como mecanismo informal para la adquisición de bienes y servicios por el Gobierno. Véase R&B Power v. E.L.A., supra, y Caribbean Communications Solutions y otros v. Policía de Puerto Rico, supra.
Por ser un método basado en negociaciones, los RFP permiten que el Gobierno negocie con los oferentes durante cada una de las etapas del proceso, a saber, desde antes que se sometan las ofertas hasta una vez sometidas las mismas.
FAR Part 15 provides for a continuing dialogue between the Government and contractors during each stage of the competitive negotiation process. For example, it encourages Government-industry exchanges of information before the release of a solicitation to improve the understanding the Government’s needs and industry capabilities, as well as extensive exchanges between Government personnel and offerors after the receipt of proposals. It also authorizes a broad range of “negotiations” that allow eligible offerors to revise their proposals. When negotiations are conducted after the establishment of the “competitive range” of offerors who have a reasonable chance of being selected for award, they are called “discussions.” Donald P. Amavas, Goverment Contract Guidebook, 3ra. Edición, Ed. West Group, 2001, sec. 6-12. Véase, secs. 6.11- 6.16.
Ciertamente, las subastas y los RFP se distinguen principalmente en que en los segundos se permiten negociaciones y modificaciones en las propuestas presentadas. Conforme a ello, Shnitzer destaca las siguientes diferencias entre ambos procesos competitivos de selección:
“. . .Unlike sealed bidding, where bids may not be modified or withdrawn between bid opening and award, changes may be made in both the solicitation and the offer in the course of [procured] negotiation. This permits a degree of flexibility not present in sealed bidding-defects and omissions may be noted and corrected, and ambiguities may be pointed out and explained. In contracts, the same defect, omission, or ambiguity in a sealed bid would most probably require its rejection.,” Shnitzer, P. Government Contract Bidding, 3d. Ed., Federal Publications, Inc. (1987, 1992 Supp.) págs. 3-11.
Como se expresa en el caso RADVA Corporation v. U.S., 17 Cl. Ct. 812 (Cl. Ct. 1989):
*1094 “In negotiated procurements, contracting officials possess broad discretion in the process of obtaining a contract most beneficial to the government. In formally advertised bidding, the pertinent statutes and regulations are far more strict about the conduct of the procurement than the statutes and regulations are in a negotiated one; consequently in negotiated procurement a contracting officer is entrusted with a relatively high degree of discretion.” Sperry Flight Systems v. U.S., 212 Ct. Cl. 329, 548 F. 2d 915, 921 (1977).
A pesar de las diferencias entre ambos procedimientos, en el método informal, al igual que en el formal, se deben enumerar los requisitos y factores que se utilizarán para la adjudicación en cuestión. Además, tienen que cumplir con los requisitos de notificación, reconsideración y revisión judicial establecidos en la L.P.A.U. Caribbean Communications Solutions v. Policía de Puerto Rico, supra; R&B Power v. E.L.A., supra. Una vez adjudicado el procedimiento informal, la agencia tiene que notificarle a las partes su determinación por escrito, sus fundamentos y el recurso de revisión disponible. R&B Power v. E.L.A., supra. Además, “le aplican las disposiciones de la L.P.A.U respecto la revisión de la determinación final de la agencia ante el Tribunal de Apelaciones”. Id. Los RFP también están revestidos de un gran interés público y deben realizarse con integridad. En virtud de ello, nuestro Tribunal Supremo expresó lo siguiente:
“Más importante aún, las adquisiciones de bienes o servicios que realice el Gobierno mediante RFP están, como toda subasta gubernamental, revestidas de un gran interés público en la protección del erario y en garantizar que dichas adquisiciones se lleven a cabo con transparencia, eficiencia y probidad.” Caribbean Communications Solutions v. Policía de Puerto Rico, supra.
En el precitado caso de Caribbean Communications Solutions v. Policía de Puerto Rico, supra, nuestro más Alto Foro reconoció la validez de un procedimiento híbrido. En dicho caso, la Policía de Puerto Rico celebró una subasta formal, pues una vez presentadas las propuestas no podían ser alteradas. No obstante, en dicho proceso formal la Policía incorporó ciertos métodos característicos de los RFP, como el mecanismo de aclaraciones (reuniones individuales con los lidiadores luego del acto de apertura) y concederle mayor participación a los licitadores al permitirles comentar sobre las ofertas de sus competidores.
Por último, la Ley Núm. 95 de 29 de junio de 1963, según enmendada, mejor conocida como la “Ley de Beneficios de Salud para Empleados Públicos”, 3 L.P.R.A. secs. 729a-729m, se promulgó con el propósito de establecer un plan voluntario de beneficios médico-quirúrgicos y de hospitalización para los empleados públicos. Los beneficios a proveerse bajo los planes descritos incluyen: servicios hospitalarios, quirúrgicos, ambulatorios, beneficios suplementarios incluyendo los dentales y obstétricos. 3 L.P.R.A. 729f(l).
En virtud de tal propósito, dicha Ley le concede al Secretario de Hacienda amplios poderes para contratar con o sin el requisito de subasta, con dos o más aseguradores que cualifiquen y ofrezcan cualesquiera de los planes, de conformidad con la referida ley. Para ello contará con el asesoramiento del Comisionado de Seguros, el Director de la Oficina Central de Administración de Personal, el Secretario de Salud y de un funcionario o socio delegado de la Asociación de Empleados del Estado Libre Asociado. 3 L.P.R.A. 729d(a).
A pesar de los amplios poderes conferidos al Secretario de Hacienda, el legislador le requirió promulgar los reglamentos que fueran necesarios para la ejecución de la aludida Ley. 729i(a). Así, la Ley establece que el Secretario está autorizado para prescribir reglamentos mediante los cuales fije las normas mínimas razonables para los planes de beneficios y para los aseguradores que ofrezcan dichos planes. De este modo, especifica lo siguiente: “[L]a aprobación del reglamento, o enmiendas al mismo, se hará previa audiencia pública a celebrarse ante él, o la persona en quien éste delegue, en la que podrá participar toda persona interesada.” 3 L.P.R.A. see. 729d(g).
Acorde con tales facultades y obligaciones, el Departamento de Hacienda aprobó el “Reglamento para la Contratación de los Planes de Beneficios de Salud para los Empleados Públicos”, Núm. 2994 de 10 de junio de *1095 1983, según enmendado. Dicho Reglamento estableció un Comité Asesor para la evaluación de las propuestas sobre planes de seguros de salud. Tal Comité estaría compuesto del Secretario de Hacienda o el funcionario que él delegue, el Comisionado de Seguros, el Director de la Oficina Central de Administración de Personal y el Secretario de Salud. El Reglamento detalla que las decisiones se tomarán por mayoría de los presentes, el quorum lo constituirá tres (3) de ellos y que el Comité llevará una minuta exacta y concisa de los procedimientos ante su consideración.
El Reglamento establece los siguientes requisitos mínimos que debe cumplir todo asegurador: (1) estar autorizado por el Comisionado de Seguros para contratar seguros de salud en Puerto Rico; (2) haber estado autorizado por el Comisionado de Seguros por lo menos durante los tres años anteriores a la fecha de contratación; (3) tener solvencia económica de conformidad con el Código de Seguros; y (4) mantener los récords estadísticos y financieros relacionados con el plan y suministrar los informes que el Secretario considere necesarios. Además, el Secretario tomará en consideración la capacidad financiera para responder por los riesgos, las facilidades para proveer, pagar o reembolsar los costos de los servicios y el cumplimiento de los contratos con el Gobierno.
ffl
Las recurrentes le imputan al Departamento haber incurrido en varios errores, los cuales, según alegan, producen la nulidad del Aviso de Certificación que les excluyó del listado de aseguradoras autorizadas a contratar seguros de salud con los empleados y pensionados del ELA.
Por considerar que el error designado D en el recurso de MAPFRE, tres y cuatro de AHI y cuatro de Golden Cross, a los que Global se adhiere, se dirigen al punto central de la controversia, los atenderemos en primer lugar.
Las recurrentes alegan, en esencia, que el Departamento incidió al utilizar criterios que no surgen de la Ley Núm. 95, el Reglamento 2994 y las Cartas Circulares para excluirlas de contratar los planes de salud. Aducen que tales criterios también son discriminatorios por cuanto favorecen los “planes grandes”, lo que sustenta la arbitrariedad de la decisión del Departamento de no certificarlas.
Por su parte, el Departamento arguye en su Alegato que su negativa a certificar a las recurrentes [15] respondió a una estrategia dirigida a proteger el interés público y no a un criterio arbitrario. Explica que tal estrategia fue el resultado del análisis de la experiencia derivada del procedimiento de contratación para el 2009. Conforme a ello, el Departamento decidió que “la mayor y más fructífera competencia surgirá [para el año 2010], no del mayor número de compañías certificadas, sino, al contrario, de la disminución del número de aseguradoras que participen en el mercado relevante.” [16] Precisa que la redistribución de las aseguradoras en un menor número “promoverá que el universo que atiende cada proveedora que continúa participando en el mercado tienda a ser más balanceado en su proporción de asegurados de alta utilización y asegurados de poca utilización. Es la aseguradora que logra un adecuado balance en este sentido la que está en posición de mejorar sus ofertas de beneficios y primas”. [17]
En consideración a las posiciones divergentes de las partes debemos resolver si el Departamento hizo un uso arbitrario y caprichoso de su discreción al no certificar a las recurrentes por tales razones.
La Ley Núm. 95 autoriza al Secretario, con el Asesoramiento del Comisionado de Seguros, el Director de ORHELA y el Secretario de Salud, entre otros funcionarios, a “contratar con o sin el requisito de subasta, con dos (2) o más aseguradores que cualifiquen de acuerdo con la ley y los requisitos al efecto y que ofrezcan cualquier o todos los planes descritos en la sec. 729e de este título.” 3 LPRA sec. 729d. Además de otros aspectos relativos propiamente a las contrataciones, la ley requiere que las tarifas que se cobren en los planes aludidos reflejen razonable y equitativamente el costo de los beneficios provistos. 3 LPRA sec. 729d(f).
*1096 Cónsono con ello, el Reglamento 2994 establece el procedimiento de evaluación de las propuestas a ser sometidas por las aseguradoras. Los artículos 7, 8 y 9 disponen los requisitos que éstas deben cumplir, a saber: proveer un resumen explicativo y/o folleto de servicios y beneficios y condiciones principales (Artículo 7a); un estudio actuarial (Artículo 7c); y un informe estadístico (Artículo 8), entre otros. Además, se requiere que la aseguradora tenga capacidad financiera para responder por los riesgos (Artículo 9), estar autorizada para contratar seguros por el Comisionado de Seguros y tener solvencia económica (Artículo 9).
Al tenor de la normativa expuesta, la Carta Circular núm. 2009-1 estableció que “[s]ólo serán elegibles aquellas Propuestas que cumplan con todos los términos de la Ley Núm. 95, leyes y reglamentos aplicables y con todos los criterios que se mencionan en esta Carta Circular. Además, tendrán que contener toda la información solicitada en la fecha requerida. [18] De este modo, la sec. 1.1.2 de dicha Carta establece que ciertos criterios, tales como tener solvencia económica; experiencia positiva durante años anteriores en la solución de querellas y en el pago de proveedores, serían de cumplimiento estricto.
De otro lado, de conformidad con la Ley Núm. 95 se aclaró en la sección 1.1.1 que la Carta Circular núm. 2009-1 no constituía una convocatoria a subasta y que el Secretario se reservaba el derecho de seleccionar un mínimo de dos propuestas de entre las sometidas. Seguidamente se dispuso que: “[l]uego de evaluarlas, [las propuestas] adjudicará a los proponentes cualificados cuya propuesta resulte ser más ventajosa para los pensionados y empleados públicos y el Gobierno de Puerto Rico.” (Énfasis nuestro) Finalmente, estableció que:
“El Secretario se reserva el derecho de aceptar o rechazar cualquier Propuesta sometida y de anular el proceso así como rechazarlas todas en cualquier momento con anterioridad a la autorización del contrato, sin incurrir por ello en alguna responsabilidad con relación al Proponente que se viera así afectado siempre y cuando sea con el propósito de salvaguardar los intereses de los beneficiarios, el interés público y el del Gobierno de Puerto Rico” see. 1.1.1. [19]
De lo antes citado se desprende que el Secretario cuenta con amplia facultad o autoridad para contratar los planes de salud para los empleados y pensionados del ELA. Asimismo, surge que éste tiene vasta discreción para utilizar el mecanismo de subasta o no, por lo que para llegar a la determinación de quiénes son los proponentes cualificados, el Secretario está en libertad de utilizar el método que estime idóneo, provisto éste se ajuste a la Ley Núm. 95 y el Reglamento 2994.
De otro lado, observamos que tanto la Ley como el Reglamento 2994 encomiendan al Secretario llevar a cabo un proceso de evaluación de las propuestas sometidas. Así, en este proceso, el Secretario estaría asistido por el Comité Asesor, integrado, entre otros, por el Comisionado de Seguros. [20]
Dentro del proceso de la evaluación y análisis de las propuestas sometidas en autos por las aseguradoras, el Secretario utilizó lo que caracteriza como una “estrategia” distinta a la utilizada en años anteriores, para la autorización de los planes de salud que serían contratados por los empleados y pensionados del ELA. Al examinar pormenorizadamente el expediente, advertimos que con tal llamada estrategia se persigue proteger el interés público por cuanto se espera que la disminución del número de aseguradoras acreciente la competitividad de las ofertas de beneficios a los empleados y pensionados y, por ende, produzcan tarifas o primas más bajas.
En consideración a que ni la Ley Núm. 95 ni el Reglamento 2994 contienen disposiciones que se adentren en la forma y manera en que el Departamento llevará a cabo ese proceso de evaluación de las propuestas, somos de opinión que el Secretario no erró al enmarcar su proceso decisional en la estrategia seleccionada, a los fines de asegurar una decisión razonable en protección del interés público.
No obstante lo anteriormente resuelto, debemos atender los cuestionamientos de cada una de las recurrentes *1097 respecto a los fundamentos esbozados en el Aviso de Certificación de 2 de febrero de 2010 para no certificarlas para contratar seguros de salud con los empleados y pensionados.
MAPFRE fue excluida por el bajo número de suscriptores (3%), lo que según el Comité Asesor que evaluó su propuesta “... no representa una masa crítica de suscriptores y evidencia la pobre acogida de su oferta por los aseguradores, ...”. [21] La exclusión de AHI obedeció a cierta información provista por el Comisionado de Seguros respecto a la situación financiera de ésta que provocó el incumplimiento con el requisito de solvencia económica.
Por otro lado, Golden Cross no fue certificada porque ella misma produjo información respecto a su poca capacidad administrativa para atender a más de 35,000 suscriptores. Con relación a Global, el recurrido se fundamenta esencialmente en que dicha recurrente ha estado vendiendo y anunciando su cubierta de beneficios a algunos municipios sin estar certificada por el Secretario para ello, por lo que incumplió la Ley Núm. 95.
Conforme al proceso evaluativo llevado a cabo por el Secretario, éste consideró que un bajo número de suscriptores es un factor de importancia por cuanto afecta la oferta de mayores beneficios y más bajas tarifas para el beneficio de los empleados públicos.
Aunque es correcto que este fundamento no forma parte de los criterios enunciados en la Ley Núm. 95, su Reglamento y la Carta Circular núm. 01-2009, ello no margina la utilización por el Secretario de otras consideraciones en su proceso evaluativo. Nótese que la aludida Carta Circular reconoce el derecho del Secretario a aceptar o rechazar cualquier propuesta sometida. Por ende, MAPFRE, al igual que las demás recurrentes, no tiene un derecho adquirido a ser certificadas por el único fundamento de que sometieron propuestas que, a su vez, cumplieron con los criterios establecidos en la normativa citada. Véase Perfect Cleaning v. Cardiovascular, 172 DPR _ (2007); 2007 JTS 172.
Respecto a las razones aducidas para descartar a AHI, entendemos que si bien es cierto que el Comisionado de Seguros dejó sin efecto su Orden relativa al menoscabo de activos notificado, ello de por sí no convierte en arbitraria su exclusión de la certificación para contratar, por cuanto la solvencia económica de las aseguradoras es un criterio de suma importancia en el mercado de seguros de salud, que se desprende claramente de la normativa aplicable y del propio expediente administrativo. Por ende, este fundamento no nos parece irrazonable debido a que el estado financiero de AHI podría incidir en la solvencia de ésta durante el año contrato 2010.
Con relación a Golden Cross, basta indicar que ésta no nos ha colocado en posición de descartar el fundamento utilizado por el Secretario para no certificarla, ya que éste le atribuye a ella misma ser la fuente que produjo la información sobre su poca capacidad administrativa.
Finalmente, del último Aviso de Certificación surge que la razón para no certificar a Global para la contratación de los planes médicos de los empleados públicos fue que ésta no estaba cumpliendo con la Ley Núm. 95 al anunciarse y vender su producto al Gobierno. Específicamente, se le imputó que estaba vendiendo su cubierta de beneficios a varios municipios, tales como Barceloneta, Arecibo y Florida.
En su escrito ante nos, Global acepta que suscribió tales contratos con empleados municipales, pero aclara que los empleados lo hicieron en su carácter individual y que acogieron sus servicios como un plan complementario. Enfatiza que no hubo violación alguna a la Ley Núm. 95 porque el Gobierno no aportaría al pago de dichas primas; que, por el contrario, los empleados las pagarían entera y totalmente. A tales efectos, hace referencia a la Ley Núm. 45 de 1972 que autoriza al Secretario de Hacienda y a los municipios, entre otros, a deducir del sueldo de los empleados que se acojan a planes complementarios la cantidad necesaria para pagar el costo total de su suscripción. 3 L.P.R.A. see. 756.
*1098 Somos del criterio que la Ley Núm. 95 claramente le delega al Secretario la autoridad para contratar las aseguradoras que ofrecerán los planes de beneficios médico-quirúrgicos y de hospitalización para los empleados públicos. De este modo, el Secretario tiene el deber de evaluar las propuestas de las diferentes aseguradoras, a los fines de determinar cuáles de éstas están calificadas para hacer negocios con el Gobierno de Puerto Rico y sus empleados. Por lo tanto, sólo las aseguradoras certificadas por el Secretario pueden ofrecer o vender sus servicios en las dependencias del Gobierno, lo que incluye a los municipios. En razón de ello, el error de Global fue ofrecer y vender sus servicios a empleados municipales en su carácter de empleado público al acudir a sus centros de trabajo, cuando no estaba acreditada por el Secretario para ofrecer sus servicios a los empleados públicos. Ño obstante, ello no significa que los empleados públicos estén impedidos de acudir, en su carácter individual, a cualquier aseguradora en el mercado (debidamente autorizada por el Comisionado de Seguros) para acogerse al plan de su predilección, como cualquier otro ciudadano de este país (claro está, si no es una aseguradora certificada por el Secretario no recibirá la aportación patronal). La actuación indebida de Global estribó en que ofreció sus servicios a tales individuos en su calidad de empleados públicos. Acorde con lo anterior, resulta razonable que el Departamento no certificara a Global por ofrecer y vender sus servicios a empleados públicos, sin contar con la debida certificación para ello.
Conforme a lo expuesto, concluimos que la actuación administrativa impugnada no fue arbitraria ni caprichosa, porque surgió como consecuencia del proceso de evaluación de las propuestas sometidas por las recurrentes que requiere la Ley Núm. 95 y el Reglamento 2994, máxime cuando está basada en consideraciones razonables, afines a la especialización o pericia del Departamento de Hacienda y su Comité Asesor. No se cometieron los errores apuntados.
Acorde con lo anteriormente determinado, tampoco le asiste la razón a MAPFRE en su planteamiento (ERROR E) de que el Departamento incidió al no tomar en cuenta la libertad de contratación de que gozan las uniones o los representantes exclusivos de los empleados conforme a la Ley Núm. 95. Por lo tanto, el hecho de que MAPFRE cumpliera con acreditar su solvencia económica y su capacidad para ofrecer los servicios que' se contratarían no es suficiente para descartar la decisión del Departamento de excluirla de la certificación.
Por otro lado, en sus segundos señalamientos de error, las recurrentes alegan que el Departamento incidió al incumplir el Reglamento 2994 por cuanto realizó un proceso de negociación que éste no contempla. No les asiste la razón.
La Ley Núm. 95 delegó en el Secretario, entre otras, la facultad para adoptar reglamentos que fijaran “... las normas mínimas razonables para los planes de beneficios descritos en la sec. 729e de este título y para los aseguradores que ofrezcan dichos planes ...”. 3 LPRA, sec. 729d(g). Cónsono con ello, aprobó el Reglamento 2994 que establece el procedimiento para la selección de las aseguradoras a ser certificadas para contratar seguros de salud con los empleados y pensionados del ELA y la evaluación de sus propuestas.
De este modo, el Artículo 5 del Reglamento 2994 establece que el Comité Asesor evaluará todas las propuestas que sometan las aseguradoras y en tal evaluación tomará en consideración que la tarifa que se vaya a cobrar refleje de forma razonable y equitativa el costo de los beneficios que se proveen. [22] También dispone que ese análisis será realizado por el Comité Asesor tomando en consideración las estadísticas compiladas por el Secretario de Salud y el Comisionado de Seguros. A su vez, el Reglamento requiere que tales estadísticas reflejen los costos de funcionamiento de los distintos planes por grupos contratados y los ingresos obtenidos por cada uno de las aseguradoras bajo contrato. [23]
No obstante, el inciso b del Artículo 5 del Reglamento contempla la situación en que las tarifas propuestas sean excesivas e irrazonable. A tales efectos, dispone que el Comité Asesor podrá citar a cualesquier asegurador ... para discutir su propuesta o recomendar que se deje sin efecto la convocatoria y emita otra convocatoria para someter nuevas propuestas.” [24] Finalmente, en su inciso c se dispone que el Comité Asesor *1099 rendirá un Informe con recomendaciones sobre las aseguradoras que han cumplido los requisitos de la Ley y el Reglamento.
Al aplicar las aludidas disposiciones del Reglamento 2994 al proceso llevado a cabo por el recurrido para la certificación de las aseguradoras, advertimos que luego de que se recibieran las propuestas de éstas, el Secretario emitió la Carta Circular 2009-11 el 16 de noviembre de 2009 en la que determinó que las tarifas así sometidas eran excesivas e inasequibles para los empleados y pensionados del ELA. En consecuencia, procedió a extender hasta el 28 de febrero de 2010 los contratos de beneficios de salud existentes (los de 2009) y determinar que los de 2010 entrarían en vigor el 1ro de marzo de 2010.
Además, en la Carta Circular 2009-13 de 3 de diciembre de 2009, el Secretario determinó que la cubierta Advantage y Medicare con farmacia parte D se renovaría automáticamente hasta el 31 de diciembre de 2010 y que los pensionados con cubierta complementaria debían realizar los trámites con las compañías certificadas para la contratación 2010.
Luego de tales eventos, el recurrido emitió el Aviso de Adjudicación originalmente notificado a las recurrentes en el que señaló que como criterio de adjudicación utilizó un proceso de negociación en el que se analizaron las tarifas y documentación sometidas por las aseguradoras y se seleccionaron aquellas propuestas que resultaron más beneficiosas para los empleados y pensionados. Particularmente, se mencionó en el Aviso de Adjudicación notificado a las recurrentes que “[s]e sometieron los hallazgos del proceso de negociación al Comité Asesor de Planes Médicos y éste sometió a su vez su recomendación al Secretario de Hacienda”. [25]
De otra parte, en el Aviso de Certificación sometido el 2 de febrero de 2010, el Departamento reiteró la negociación como el proceso utilizado. Sin embargo, especificó que éste se limitó a las aseguradoras que presentaron propuestas de cubierta comercial para los empleados y que no lo hubo con relación a las compañías interesadas únicamente en la certificación para la cubierta Medicare Advantage para los pensionados.
De lo expuesto se desprende que, contrario a lo argüido por MAPFRE y AHI, no se llevó a cabo proceso de negociación alguno con relación a la cubierta Medicare Advantage en tomo a las cuales dichas recurrentes presentaron propuestas.
Ahora bien, aunque el Departamento hubiese llevado a cabo un proceso de negociación sin habérselo notificado a las recurrentes como arguyen, ello no hubiese sido suficiente para anular el Aviso de Certificación impugnado. El Artículo 5b del Reglamento no proscribe o prohíbe el método de la negociación en el proceso de evaluación de las propuestas. Al contrario, éste faculta expresamente al Comité Asesor a citar a cualquier asegurador “para discutir su propuesta”. [26]
Por último, precisa señalar que aunque Golden Cross alega que no se le notificó del procedimiento de negociación, lo cierto es que ella misma señala en el recurso que celebró reuniones con oficiales del Departamento durante el proceso de evaluación en tomo a la cubierta, tarifas y aspectos financieros, entre otros. [27] Por lo tanto, no le asiste la razón en su planteamiento.
Las recurrentes también reclaman que el Departamento violó las disposiciones del Reglamento 2994 al no grabar la reunión del Comité Asesor cuando seleccionó las propuestas certificadas y al no rendir el Informe requerido por dicho Reglamento. Asimismo, impugna lo decidido por el Comité Asesor debido a la falta de quorum.
El Artículo 4 del Reglamento 2994 dispone lo siguiente:
“ARTICULO 4 - COMITÉ ASESOR PARA LA EVALUACIÓN DE LAS PROPUESTAS PARA PROVEER *1100 UN PLAN DE BENEFICIOS DE SALUD PARA LOS EMPLEADOS PUBLICOS
a- El Comité Asesor para la evaluación de las propuestas sobre planes de beneficios de salud estará compuesto de la siguiente manera:
1- El Secretario de Hacienda quien será su Presidente, o el funcionario en quien él delegue de conformidad con la facultad que le requiere la Ley Núm. 41, aprobada el 9 de junio de 1956, (3 LPRA 231a).
2- El Comisionado de Seguros.
3- El Director de la Oficina Central de Administración de Personal.
4- El Secretario de Salud.
b- El Comité Asesor, durante el proceso de evaluar las propuestas que se sometan a su consideración, podrá consultar y citar a sus reuniones a los siguientes funcionarios:
1- El Director del Negociado de Seguros Públicos o su representante.
2- El Asesor Legal del Secretario o su representante.
3- El Director de la Administración de Facilidades de Salud o su representante.
4- El Director del Negociado de Sistemas de Contabilidad del Departamento de Hacienda o su representante.
c- El Comité Asesor se reunirá en la fecha, hora y lugar previa convocatoria al efecto del Secretario, o a solicitud de cualesquiera de sus miembros presentes. De los acuerdos tomados en cada reunión se levantará un acta la cual será aprobada en la siguiente reunión que se convoque.
d- El quorum lo constituirá tres (3) de sus miembros.
e- El Comité Asesor llevará una minuta exacta y concisa de los procedimientos ante su consideración. Disponiéndose, además, que dichos procedimientos, incluyendo la apertura de las propuestas en la fecha, hora y lugar señalado, serán grabados en cinta magnetofónica.” [28] (Énfasis nuestro)
Conforme surge de la Minuta de Reunión Oficial del Comité Asesor de Planes Médicos en la reunión celebrada el 28 de diciembre de 2009, estuvieron presentes el Sr. Ramón Cruz, Comisionado de Seguro, el Secretario y un representante de ORHELA, la Sra. Arlene L. Alsine Santiago y la Sra. Magalis Marcón Pérez, en representación del Departamento de Salud.
Las recurrentes arguyen que la ausencia del Director de ORHELA y del Secretario de Salud de tal reunión produjo la falta del quorum requerido de tres (3) funcionarios presentes. No les asiste la razón.
Si bien es cierto que conforme a la Minuta sólo comparecieron a la aludida reunión del Comité Asesor el Secretario y el Comisionado de Seguros y que el Reglamento sólo permite al primero delegar tal facultad, somos del criterio que el hecho de que el Director de ORHELA no compareciera personalmente y que designara un representante no anula lo allí decidido.
Conforme a su Ley Núm. 184 de 3 de agosto de 2004, Ley para la Administración de Recursos Humanos del
*1101 Servicio Público del Estado Libre Asociado de Puerto Rico, 3 LPRA see. 1461 et seq., el Director de ORHELA tiene el poder de “[d'Jelegar cualquier función o facultad que le haya sido conferida excepto la de adoptar y aprobar reglamentos”. 3 LPRA sec. 1461b(l)(e). [29]
Acorde con ello, no tienen razón las recurrentes al reclamar que no hubo el quorum necesario para tomar las decisiones sobre las aseguradoras a ser certificadas, por cuanto estuvieron presentes tres de los funcionarios miembros del Comité Asesor.
Entendemos que lo decidido tampoco es nulo por carecer de una grabación. Aunque hubiese sido deseable la existencia de tai grabación, la ausencia de ésta no convierte en nulo el procedimiento celebrado, ya que las recurrentes han podido suplir la falta de ésta por medio de la Minuta aludida y presentar fundamentadamente sus recursos de revisión.
Por último, las recurrentes cuestionan la adjudicación en pugna porque el Comité Asesor no emitió un Informe.
El Reglamento 2994 requiere en su Artículo 5(c) sobre la evaluación de las propuestas, lo siguiente:
“5. ...
c- El Comité Asesor rendirá al Secretario un Informe escrito en el que hará recomendaciones sobre los aseguradores, organizaciones de empleados y organizaciones de servicios de salud (HMO) que han cumplido con todos los requisitos de la Ley y de este Reglamento. Cualquier miembro del Comité Asesor podrá someter objeciones y/o recomendaciones por separado. [30]
Asimismo, el Artículo 4e dispone que “[e]l Comité Asesor llevará una minuta exacta y concisa de los procedimientos ante su consideración ...”. [31]
De nuestro examen del voluminoso Apéndice provisto por la recurrente MAPFRE surge que el Comité Asesor preparó el Informe de Hallazgos Documentos Administrativo Planes Médicos Contratación 2010 de 17 de noviembre de 2009. [32] Con ello, entendemos que el Comité Asesor le dio cumplimiento sustancial al Reglamento 2994. No se cometieron estos errores.
De otro lado, MAPFRE y AHI reclaman que el Departamento incidió al adoptar posiciones inconsistentes respecto a éstas. Cuestionan que por un lado, el Secretario les requiriera extender la cubierta Medicare Advantage hasta el 31 de diciembre de 2010, cosa que hicieron, y por otro, las excluyera de contratar al amparo de la Ley Núm. 95. No les asiste la razón.
Según se desprende del expediente sometido por MAPFRE, la extensión de la cubierta Medicare Advantage surgió como resultado de la evaluación inicial que de las tarifas sometidas por las aseguradoras proponentes hiciera el Secretario. Así, éste concluyó que tales tarifas propuestas eran excesivas e inasequibles. Por ende, al concluir que éstas no salvaguardaban los mejores intereses públicos y del Gobierno de Puerto Rico, determinó en la Carta Circular núm. 2009-11 extender la fecha de efectividad de los contratos de beneficios de salud existentes y sus tarjetas hasta el 28 de febrero de 2010. [33] Cónsono con ello, en la Carta Circular 2009-13 determinó que la cubierta Advantage y Medicare con farmacia parte D se renovaría automáticamente hasta el 31 de diciembre de 2010. [34]
Según refleja el expediente, no se sostiene que el Secretario adoptara posiciones inconsistentes, sino lo contrario, que actuó conforme a las facultades y discreción que la Ley Núm. 95 le otorga en beneficio del interés público, lo que también surge del Aviso de Certificación impugnado. No se cometió el error señalado.
*1102 Por otra parte, las recurrentes también alegan que el Departamento erró al negarles acceso a la totalidad del expediente. Resolvemos.
En Trans Ad de P.R. V. Junta de Subastas, 174 DPR_(2008), 2008 JTS 130, el Tribunal Supremo de Puerto Rico resolvió lo siguiente respecto al acceso a los expedientes administrativos:
“... el expediente administrativo que contiene la documentación relacionada con el trámite de un procedimiento de subasta es, necesariamente, un documento público. Ahora bien, como acotáramos anteriormente, los procedimientos de subastas se caracterizan, en parte, porque las propuestas de los licitadores se presentan bajo un palio de secretividad. Asimismo, la dependencia gubernamental conduce las etapas anteriores a la adjudicación de la buen pro sin la intervención de personas ajenas al trámite administrativo interno.”
Reconocemos que ambas características responden al interés público de garantizar la competencia justa entre las propuestas. Sin embargo, dicho interés se desvanece una vez adjudicada la subasta, cuando la agencia ha ejercido su criterio adjudicativo. Por lo tanto, resolvemos que, de ordinario, una vez se ha adjudicado la buena pro de una subasta, el expediente que contiene los documentos recopilados en el trámite de la misma está sujeto a la inspección de cualquier ciudadano en virtud del Artículo 409 del Código de Enjuiciamiento Civil.
Aunque el proceso llevado a cabo en el caso de autos no constituye una subasta, sino uno sui generis bajo el palio de la Ley Núm. 95 y el Reglamento 2994, no albergamos duda alguna que las recurrentes, al igual que las demás aseguradoras, tienen el derecho a examinar el expediente administrativo.
Conforme surge del expediente ante nos, las recurrentes fueron diligentes al solicitar el acceso al expediente administrativo de autos tan pronto recibieron los Avisos de Adjudicación originales. En respuesta, el Departamento les solicitó que especificaran los documentos interesados y luego de varias gestiones, les proveyó copia del Informe de Hallazgos Documentos Administrativos Planes y la Minuta de Reunión Oficial del Comité Asesor de Planes Médicos de 28 de diciembre de 2009.
Coincidimos con las recurrentes en que el Departamento debió proveerles inmediatamente el acceso solicitado a los documentos del expediente relativos a las propuestas ya evaluadas, [35] pero no podemos soslayar el hecho de que el Informe de Hallazgos y la Minuta provistas fueron suficientes para que las recurrentes presentaran sus muy bien fundamentados recursos y defendieran sus derechos.
En consecuencia, a pesar de que el aludido error imputado fue cometido, el mismo no lesionó o menoscabó los derechos de MAPFRE, AHI, Golden Cross y Global.
Por último, las recurrentes alegan que el Departamento erró al no fundamentar su decisión de certificar a ciertas proponentes y descartar las otras y al no incluir en su Aviso de Adjudicación originalmente emitido el 28 de diciembre de 2009 las advertencias requeridas por la LPAU y la jurisprudencia sobre su derecho a solicitar reconsideración y la revisión judicial.
Aunque somos del criterio que a las recurrentes les asiste la razón, ya el error fue subsanado, lo que lo convierte en académico.
Nótese que al estudiar los recursos presentados, en particular el de MAPFRE, el Panel requirió al Departamento emitir un nuevo Aviso de Adjudicación, al tenor de la Regla 83.1 de nuestro Reglamento, debido a que el Aviso notificado originalmente a las partes no contenía los fundamentos mínimos necesarios para ejercer nuestra función revisora. Así, en respuesta, el Departamento presentó el 29 de enero de 2010 un Aviso enmendado que tituló Aviso de Certificación el que, a pesar de incluir las advertencias sobre el derecho a la reconsideración y la revisión judicial, aún no tenía fundamentos suficientes para poder revisar la actuación *1103 administrativa impugnada. En consecuencia, el recurrido finalmente presentó el 2 de febrero de 2010 el Aviso de Certificación en cumplimiento con lo requerido. Además, las recurrentes tuvieron la oportunidad de suplementar sus escritos luego de emitidos los Avisos de Adjudicación.
Acorde con lo anterior, entendemos que cualquier posible menoscabo que las recurrentes hubiesen sufrido por un Aviso de Adjudicación o Certificación defectuoso fue curado.
Al tenor de lo dicho, resolvemos que el Departamento de Hacienda no actuó irrazonablemente o en exceso de su discreción al haber utilizado en su proceso evaluativo para emitir los Avisos de Certificación el fomento de la competitividad entre las aseguradoras por medio de la reducción del número de proveedores de beneficios de salud. Por ende, las recurrentes no tenían un derecho a ser certificadas únicamente porque cumplieron con los requisitos para sus propuestas delineados en la Ley Núm. 95, el Reglamento 2994 y la Carta Circular 1-2009.
Finalmente, debemos hacer constar que si el Departamento de Hacienda dedicara un mínimo de cuidado y claridad en la redacción del Aviso de Adjudicación impugnado, el estudio y resolución de estos recursos habría sido menos azaroso. Resalta de los autos que el Aviso de Adjudicación notificado a las recurrentes, además de no contener los fundamentos de la decisión administrativa requerida por la LPAU y su jurisprudencia, no advirtió a las partes de su derecho a solicitar reconsideración y la revisión judicial. No obstante, el Aviso de Adjudicación de igual fecha notificado a las proponentes certificadas contenía las advertencias de rigor aunque no pudiese ser considerado un modelo de redacción. Tales defectos fueron salvados por la diligencia desplegada por las recurrentes y sus abogados en presentar oportunamente sus recursos. Véase IM Winner, Inc. v Mun. de Guayanilla, 151 DPR 30 (2000).
IV
Por los fundamentos expuestos, se confirma el Aviso de Certificación emitido por el Departamento de Hacienda el 2 de febrero de 2010 y se deniega la Moción en Auxilio de Jurisdicción presentado por las recurrentes.
Notifíquese inmediatamente por correo electrónico o teléfono o telefax y por la vía ordinaria.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2010 DTA 54

. AHI, Golden Cross y Global también solicitaron remedios en auxilio de jurisdicción.

. Apéndice del recurso KLRA-2010-00068, pág. 1703. Salvo que otra cosa se indique, la referencia a los documentos del Apéndice corresponde al KLRA-2010-00068 presentado por MAPFRE.

. Apéndice del recurso, págs. 1704-1705.

. Apéndice del recurso, pág. 1770.

. El Comité Asesor aprobó las siguientes aseguradoras:
Asociación de Maestros de Puerto Rico (PROSAM) First Medical Health Plan, Inc.
MCS Life Insurance Co. Inc.
Option Health Care/National Life Insurance Co.
*1104 Ryder Health Plan
Triple-S-Salud Inc.
Plan de Salud del Hospital Menonita
Humana-Advantage
Medicare y Mucho Más (MMM).

. El Comité excluyó a:
American Health Care
Global Health Plan & Insurance Co.
Golden Cross Health Plan Corp.
MAPFRE Life Insurance Company.

. Apéndice del recurso, pág. 1725.

. Surge de los autos que el 28 de diciembre de 2009, el Departamento cursó a las aseguradoras certificadas en Aviso de Adjudicación que aunque tenía el mismo propósito que el cursado a las recurrentes, su contenido era un tanto diferente. Además contenía las advertencias sobre el derecho a solicitar reconsideración y revisión judicial, lo que se omitió en el notificado a las recurrentes.

. AHI, Golden Cross y Global también solicitaron reconsideración respectivamente, el 31 y 30 de diciembre de 2009 y el 12 de enero de 2010, acceso al expediente administrativo del Departamento lo que también hizo Global con similar resultado que MAPFRE.

. Véase anejo a Moción en Cumplimiento de Resolución y Solicitud de Término Adicional presentada por el recurrido el 29 de enero de 2010.

. En su recurso, AHI señaló los siguientes errores:
“(1) EL MISMO NO CUMPLE CON LOS REQUERIMIENTOS DE LA LEY DE PROCEDIMIENTO ADMINISTRATIVO UNIFORME;
(2) SE INCUMPLIÓ CON EL PROCEDIMIENTO ESTABLECIDO EN EL REGLAMENTO 2994 DEL DEPARTAMENTO DE HACIENDA;
(3) LA DENEGATORIA DE AMERICAN HEALTH, INC. COMO ASEGURADORA CERTIFICADA FUE UNA ARBITRARIA QUE NO TIENE BASE EN LA LEY, EL REGLAMENTO O LAS CARTAS CIRCULARES DEL DEPARTAMENTO DE HACIENDA, YA QUE AMERICAN HEALTH CUMPLE CON TODOS LOS REQUISITOS DISPUESTOS;
(4) LA DETERMINACIÓN NOTIFICADA EN EL “AVISO DE ADJUDICACIÓN” LACERA EL INTERÉS PÚBLICO QUE PERSIGUE LA LEY NÚM. 95 DE JUNIO DE 1963, 3 LPRA 729A, ETSEQ;
(5) LACERA LOS DERECHOS DE AMERICAN HEALTH ADQUIRIDOS MEDIANTE EL PERFECCIONAMIENTO DEL CONTRATO DE 23 DE DICIEMBRE DE 2009; Y
(6) NO SE LE HA CONCEDIDO A AMERICAN HEALTH ACCESO A LA TOTALIDAD DEL EXPEDIENTE ADMINISTRATIVO.”
Por su parte, Golden Cross alegó que:
“PRIMER ERROR: EL AVISO DE ADJUDICACIÓN NO CUMPLE CON LOS REQUISITOS DE LA LEY DE PROCEDIMIENTO ADMINISTRATIVO UNIFORME.
SEGUNDO ERROR: EL PROCESO DE ADJUDICACIÓN LLEVADO A CABO POR EL DEPARTAMENTO DE *1105 HACIENDA NO CUMPLIÓ CON LAS DISPOSICIONES APLICABLES DE LA LEY NÚM. 95, NI DEL REGLAMENTO 2994, NI DE LAS CARTAS CIRCULARES EMITIDAS POR EL SECRETARIO DE HACIENDA, POR LO CUAL ADOLECE DE NULIDAD.
TERCER ERROR: SE LE HA IMPEDIDO A GOLDEN CROSS, AL IGUAL QUE A MAPFRE, EL ACCESO AL EXPEDIENTE ADMINISTRATIVO Y A LOS EXPEDIENTES DE LAS PROPUESTAS SOMETIDAS Y CONSIDERADAS EN EL PROCESO DE ADJUDICACIÓN.
CUARTO ERROR: SE EXCLUYÓ DE MANERA ARBITRARIA Y CAPRICHOSA A GOLDEN CROSS, AL IGUAL QUE A MAPFRE, DEL GRUPO DE ENTIDADES PROPONENTES SELECCIONADAS PARA LA CONTRATACIÓN DE PLANES DE BENEFICIOS DE SALUD BAJO LA LEY NÚM. 95, EN VIOLACIÓN AL DEBIDO PROCESO DE LEY, Y LO CUAL LE ESTÁ CAUSANDO A GOLDEN CROSS DAÑOS INMEDIATOS E IRREPARABLES A CAUSA DE LAS ACTUACIONES ILEGALES, ARBITRARIAS E IRRAZONABLES DEL DEPARTAMENTO DE HACIENDA.”
Finalmente, Global adoptó los enures de las demás recurrentes.

. Anejo a Urgente Moción en Cumplimiento de Orden presentada por el recurrido el 2 de febrero de 2010.

. Anejo a Urgente Moción en Cumplimiento de Orden presentada por el recurrido el 2 de febrero de 2010.

. Id.

. Aunque el Alegato del Departamento de Hacienda se limita a lo alegado por MAPFRE, entendemos que lo allí argumentado se extiende a las demás recurrentes.

. Alegato del Departamento de Hacienda, pág. 6.

. Id.

. Apéndice del recurso, pág. 2.

. Apéndice del recurso, pág. 2.

. Carta Circular 01-2009, sec. 1.2.4, Reglamento 2994, Artículo 5.

. Aviso de Certificación de 2 de febrero de 2010, pág. 15.

. Apéndice del recurso, pág. 1806.

. Id.

. Id.

. Apéndice del recurso, pág. 1707.

. Apéndice del recurso, pág. 1806.

. Recurso KLRA-2010-00095, pág. 3.

. Apéndice del recurso, págs. 1804-1805.

. Aunque la Ley Orgánica del Departamento de Salud, Ley Núm. 81 de 14 de marzo de 1912, según enmendada, no es tan explícita como la referente a ORHELA en cuanto a la facultad de delegación de poderes que tiene el Secretario, de su texto se puede inferir que sí tiene dicha facultad.

. Apéndice del recurso, pág. 1806.

. Apéndice del recurso, pág. 1805.

. Apéndice del recurso, pág. 1715.

. Carta Circular núm. 2009-11; Apéndice del recurso, pág. 1703.

. Carta Circular núm. 2009-13, Apéndice del recurso, pág. 1704. Dicha Carta estableció el itinerario de trabajo del que surge que el 7 de febrero de 2010 se designó como fecha límite para entregar la solicitud de ingreso, el 8 de febrero de 2010 para entregar la cinta de descuentos al Departamento de Hacienda y 28 de febrero de 2010 para la emisión y entrega de tarjetas nuevas.

. Somos del criterio que el Departamento pudo haber tomado medidas cautelares de haber existido en el expediente información sensitiva o confidencial de las aseguradoras que debía ser protegida de los competidores.