ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Chromalloy Component Services, Inc. | ) | ASBCA No. 63408 |
| | ) | |
| Under Contract No. FA8122-20-D-0002 | ) | |

APPEARANCE FOR THE APPELLANT:        William Weisberg, Esq.
                                                    Law Offices of William Weisberg PLLC
                                                    McLean, VA

APPEARANCES FOR THE GOVERNMENT:    Caryl A. Potter, III, Esq.
                                                    Air Force Deputy Chief Trial Attorney
                                                  Geoffrey R. Townsend, Esq.
                                                    Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

The United States Air Force (Air Force or government) entered into a contract with appellant, Chromalloy Component Services, Inc. (Chromalloy) for the remanufacture of low pressure turbine assemblies for F108 aircraft engines,[1] used on KC-135 military cargo aircraft. As part of the remanufacture process, Chromalloy inspects the 174 stage 1 blades and replaces blades when necessary. Prior to the contract at issue, the government permitted the use of commercially serviceable (used) fan blades at a cost of around $100 per blade. At that time, the cost of a new original equipment manufacturer (OEM) blade was around $1,700.

The engine manufacturer subsequently provided revised guidance requiring replacement of certain fan blades. As a result, the solicitation for the contract at issue required the use of new OEM fan blades. Coincident with the revised manufacturer guidance, and predating the submission of bids on the contract, the price of OEM fan blades increased from approximately $1,700 per blade to $5,100 per blade.

Due to concerns regarding the price and availability of stage 1 blades, the government modified the contract such that bidders were required to propose a price for stage 1 blades for the base year, but the option year pricing was listed as to be determined. Chromalloy was awarded the contract, with a fixed price of $5,202 per stage 1 blade. However, the price of stage 1 blades continued to increase, reaching $5,655 per blade. The government subsequently modified the contract to make the

---

[1] The F108 engine is the military equivalent of the CFM56 aircraft engine used on commercial aircraft (tr. 14).

blades government furnished material (GFM), but not until after Chromalloy purchased a large number of blades for inventory.

Chromalloy appeals from a Contracting Officer's Final Decision (COFD) denying its claim for additional compensation due to the government's purported failure to share superior knowledge regarding pricing of the stage 1 blades; the change from contractor furnished stage 1 blades to government furnished material resulting in residual inventory; and a change to the course of dealings between the parties when the government placed a large order near the end of the base period, rather than ordering at the higher option year price. The Board held a virtual hearing where both parties presented evidence and testimony. We deny Chromalloy's appeal for the reasons stated below.

FINDINGS OF FACT

On January 17, 2019, the Air Force Materiel Command posted Request for Proposal No. FA8122-19-R-0001 (RFP) on the Federal Business opportunities website (R4, tab 1 at 1). The RFP sought the complete remanufacture of USAF Module 13/15, which is part of the Low Pressure Turbine (LPT) major module of the F108 engine used on the KC-135 aircraft (R4, tab 101 at 1).

At the time of the solicitation, Chromalloy was the incumbent contractor, and had performed F108 aircraft engine contracts dating back to 2004 (tr. 13-14, 35). Remanufacture of the LPT module involved tearing down the engine and replacing or repairing component parts, including the LPT Stage 1 blades (tr. 15, 23). The engine manufacturer CFM International (CFM) is a joint venture between Safran Aircraft Engines (Safran) and GE Aerospace (GE) (tr. 16). Around 2012, CFM issued a service bulletin indicating that certain blades, identified by serial number, were suspect and should be replaced (tr. 32). The concern was that the suspect blades could de-latch from the disk causing internal damage to the engine (tr. 91).

There are 174 LPT stage 1 blades in each engine (tr. 33). When a blade needed to be replaced, either because it was damaged, or was on the list of suspect blades, the predecessor contract permitted Chromalloy to use commercially serviceable blades – that is, commercially flown blades from civilian equivalent CFM56 engines (tr. 33). The commercially serviceable blades were available on the market for around $100 per blade, while a new OEM blade was priced around $1,700 per blade (tr. 15, 33). Over time, additional service bulletins increased the number of suspect blades, creating supply issues with replacement blades (tr. 32-34). During the solicitation period, Chromalloy had discussions with Aviall, the OEM part distributor, and learned that the price of new OEM blades was increasing from around $1,700 per blade to $5,100 per blade. As was the case for the prior contract, the RFP initially permitted the awardee

2

to use commercially serviceable parts but was later amended to require new blades. (Tr. 34-36; R4, tab 11 at 2)

The RFP provided for a 1-year base period, plus four 1-year option periods (R4, tab 1 at 5). The RFP initially had a single priced Contract Line Item Number (CLIN), which was for a complete remanufactured unit, including all parts and labor (*id*. at 6). Chromalloy filed a pre-award protest with the Government Accountability Office (GAO) on March 6, 2019, alleging the government failed to accurately describe its requirements by not including historical data as part of the RFP, and alleging that the single CLIN encouraged unbalanced pricing (R4, tab 89 at 1). Following discussions with the government, Chromalloy withdrew its protest on March 12, 2019 (R4, tab 90 at 1).

In response to issues raised by Chromalloy and other vendors, the government amended the RFP and Statement of Work (SOW). Amendment 0007 added a SubCLIN for the blades, X001AA (where X designates the base or option year). (R4, tab 11 at 2) Amendment 0008 modified the pricing structure so that offerors were to propose a price for 0001AA (the base year), but the option year SubCLINs were amended to read "TBD" or "To Be Determined." (R4, tab 14 at 2). Amendment 0008 also added the following language to each option year SubCLIN for the blades: "Upon exercising an option, the Government reserves the right to negotiate option year unit pricing or provide new blades as Government Furnished Material (GFM)." (*id*. at 8, 10, 13, 16).

On August 5, 2019, Chromalloy filed an additional pre-award protest with GAO alleging that the RFP contained a requirement that was impossible for any offeror to meet (R4, tab 91 at 1). Specifically, Chromalloy alleged that new blades were not available to purchase at any price (*id*. at 5). The GAO denied Chromalloy's protest on November 6, 2019 (R4, tab 92 at 1). The government received Chromalloy's proposal on December 5, 2019, and awarded Contract No. FA8122-20-D0002 to Chromalloy on April 17, 2020 (R4, tab 19 at 1).

Chromalloy contends that the government provided assurances, prior to contract award, that OEM blades would be available at $5,100 per blade during the base year of the contract. Sam Malone, Chromalloy's lead of military practice during the solicitation period, testified that the government had provided information on what the blade pricing would be, however, he also admitted that he had not received the information directly from the government, but instead through another Chromalloy employee, Ms. Mackell (tr. 11, 18, 28-29).

Ms. Tamara Mackell, Chromalloy's senior government contracts manager, testified that Chromalloy had received assurances from the government that the price of the blades would be stable through the base contract year (tr. 30, 39-40; R4, tab 94

3

at 3-4, 6-7 (Chromalloy's claim discussing such assurances)). Ms. Mackell also testified regarding a June 17, 2020 telephone call with the contracting officer. This call, which took place after contract award, addressed changes in blade pricing and availability. (Tr. 39-40; R4, tab 94 at 7 (Chromalloy's claim discussing telephone call)) After award, GE required Chromalloy to purchase blades directly from GE and not through the part supplier Aviall (tr. 40). In addition, GE requested that Chromalloy provide "seed money" to produce the blades, and notified Chromalloy of a price increase for the blades (*id.*). According to Ms. Mackell, the contracting officer, Mr. Christopher Matthews, stated "we need to make this right, we need to make you whole on this," and that Mr. Matthews stated that he would have stopped an order issued late in the contract base year had he been in the office when the order was issued (tr. 41, 66).

Mr. Matthews testified that he never provided assurances to Chromalloy regarding the pricing of the blades (tr. 82). He further testified that his communications with the manufacturer concerned availability and the reasons for the price increase in the prior year (tr. 87-88).

The contract is a commercial, firm-fixed price, indefinite-delivery, indefinite-quantity contract. The contract consists of an informational CLIN (0001–4001), a priced SubCLIN (0001AA-4001AA) for remanufacture of LPT module 13/15, a priced SubCLIN (0001AB–4001AB) for new blades, and a data CLIN (0002–4002) (R4, tab 101 at 2). The SubCLIN for new blades was priced for the base year at $5,202 per unit and listed as "To Be Negotiated" for all option years (R4, tab 19 at 5, 7, 10, 12, 14). Each SubCLIN for new blades also included the language from the RFP: "Upon exercising an option, the Government reserves the right to negotiate option year unit pricing or provide new blades as Government Furnished Material (GFM)" (*id*. at 8, 10, 12, 15). Furthermore, the contract states in the preamble, "This is a Remanufacture requirement. No Government Furnished Material (GFM) shall be provided for remanufature [sic] CLINs and the base year new blade subCLIN. GFM may be considered, at the Government[']s direction, for new blade subCLINs on option year(s). Contractor Furnished Material (CFM) is required for all remanufacture described herein." (R4, tab 19 at 3)

The contract required Chromalloy to purchase new OEM blades from government-approved sources. CFM International, the OEM, published a catalog of various parts, including the blades, each year with prices effective on November 1 of the given year (R4, tab 67 at 3-5, 9; tr. 27). Occasionally the catalog stated "QUOTE" instead of providing a price. Such was the case in the catalog with prices effective on November 1, 2019. (*Id.* at 5) On September 12, 2019, Chromalloy received a quote on the blades in the amount of $5,100 each (*id*. at 6). On June 23, 2020, Chromalloy received a quote of $5,370 per blade with a note that the price would change again on November 1 (*id*. at 7). Chromalloy did not seek an updated price quote between

4

November 1, 2019 and submitting its bid in December 2019 (tr. 26, 48). According to the catalog, the price per blade increased to $5,655 on November 1, 2020 (R4, tab 67 at 9).

The contract includes a minimum quantity for new LPT stage 1 blades of 700 units and a maximum quantity of 50,400 units (R4, tab 19 at 4). Each SubCLIN for blades includes a best estimated quantity. The best estimated quantity for the base year was 7,840. (*Id*. at 5) During the base year of the contract, the government issued four orders for a total of 6,171 blades (R4, tab 32 at 2, tab 38 at 2, tab 43 at 2, tab 46 at 2). On April 17, 2021, the government exercised Option Year 1 (R4, tab 23 at 1). In exercising the option, the government left the price of the blades as "To Be Negotiated" (*id*. at 4). Through a bilateral modification on December 15, 2021, the government exercised its right to provide the blades as GFM going forward (R4, tab 24 at 1).

On March 21, 2021, the government issued Task Order No. FA8122-21-F-0030 for the remanufacture of 24 modules (R4, tab 44 at 1, 3). There were bilateral modifications of the task order on November 23, 2021 and December 14, 2021 to add 218 and 155 blades, respectively (R4, tabs 45-46 at 1-2). The modifications priced the blades at the contract's base year price of $5,202 per blade. (R4, tabs 45-46 at 4) Ms. Mackell testified that over the course of prior contracts, the government sometimes placed orders late in the contract year, but the orders were limited to work that could be performed over a 30 to 60 day period (tr. 43). Mr. Matthews, the contracting officer, testified that it was not unusual to place a large order late in a contract period, citing two orders of 60 modules just prior to exercising the option for the next option year (tr. 91). He indicated that the quantity included in any order was highly variable because it was based on estimates of future flying (tr. 90-91).

In option year one of the contract, the government began providing the blades as government furnished material (tr. 52). Around the time of the option year, one of Chromalloy's business units accidentally ordered a number of blades. Chromalloy attempted to cancel the order, but GE refused the request because the blades were already being manufactured. (Tr. 64-65)

On February 15, 2021, Chromalloy submitted a request for an equitable adjustment (REA) to the contracting officer (R4, tab 56 at 1). The contracting officer denied the REA on June 17, 2021 (R4, tab 57 at 1-2). On October 13, 2021, Chromalloy submitted a revised REA on substantially similar facts (R4, tab 60 at 1). The contracting officer denied the second REA on October 20, 2021 (R4, tab 70 at 1-2). Chromalloy submitted a claim dated May 26, 2022, again based upon substantially similar facts (R4, tab 94 at 1). The contracting officer denied the claim on June 27, 2022 (R4, tab 101 at 1-2). Chromalloy timely appealed to the Board. The Board held a one-day hearing on September 4, 2024.

5

DECISION

Chromalloy's complaint asserts three causes of action. First Chromalloy asserts that the government possessed superior knowledge regarding the availability and pricing of the LPT stage 1 blades which it communicated to Chromalloy, and that Chromalloy relied upon it in pricing its bid (compl. ¶ 20). Chromalloy also characterizes this cause of action as promissory estoppel (*id.*). Second, Chromalloy contends that it relied upon government assurances that the blades would be contractor furnished, and not government furnished, in purchasing a number of blades and thus, was left with a residual inventory of blades (compl. ¶ 21). Chromalloy's third cause of action is an alleged change to the course of dealing when the government placed a large order near the end of the base year of the contract, to be performed during the option year, at the lower base year pricing (compl. ¶¶ 22-24). Chromalloy also characterizes its claim as a constructive change to the contract (compl. ¶ 26). Chromalloy did not submit a pre-hearing brief. Its three-page[2] post-hearing brief fails to present any legal argument and does not cite any case law nor any statutes or regulations. Instead, Chromalloy argues that it is entitled to relief if the Board finds credible the testimony of its witnesses (app. br. at 3).

I. Chromalloy Has Not Established The Existence of Superior Knowledge

Chromalloy's first cause of action alleges that the government possessed superior knowledge regarding the availability and pricing of blades. As a general rule, a contractor performing a fixed-price contract assumes the risk of unexpected costs. *See, e.g., Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 777-78 (Ct. Cl. 1963). However, the government has an implied duty to "disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012) (*quoting Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000). Superior knowledge generally applies when:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

---

[2] Chromalloy's brief wraps onto a fourth page only because of a 7½" bottom margin on page 2.

6

*Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994) (*quoting American Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981)).

As an initial matter, we find that Chromalloy has not demonstrated, or even properly alleged, that the government possessed superior knowledge regarding future pricing of the blades. Expectations or judgment regarding future events, rather than existing facts do not support a superior knowledge claim. *See, e.g., ACC Constr., Co.*, ASBCA Nos. 62265, 62937, 22-1 BCA ¶ 38,194 at 185,481; *aff'd*, No. 2023-1372, 2024 WL 2064620 (Fed. Cir. May 9, 2024). For the government to possess superior knowledge of future blade prices, Chromalloy would need to establish that the manufacturer or distributor shared with the government its pricing plans for the blades, not simply that it expected prices to remain stable. In fact, Chromalloy's claim asserts that the government did not intentionally mislead Chromalloy but rather that it might have passed on bad information that it received from the blade manufacturer or distributor (R4, tab 94 at 3-4). Thus, it is not clear that Chromalloy is even alleging that the government possessed superior knowledge.

Moreover, Chromalloy has not shown that it was misled by a contract specification. Instead, the hearing testimony of Chromalloy's witnesses established that Chromalloy was aware of availability issues and price increases for the blades (tr. 14) and that Chromalloy had a relationship with the distributor, Aviall (tr. 34). Chromalloy further knew that the blade prices typically increased in November of each year, (tr. 27) yet failed to seek updated information before submitting its bid (tr. 26, 48).

At best, Chromalloy cites to an alleged promise made by the contracting officer on June 17, 2020 (tr. 39-40; R4, tab 94 at 7). Even if we were to credit the testimony of Chromalloy's witness over the contracting officer's denial that he made such a statement (tr. 82), the alleged statement was made *after* Chromalloy made its bid and thus could not have been superior knowledge that would have effected performance cost or duration.

To the extent Chromalloy is asserting a claim for promissory estoppel (compl. ¶ 19) we deny the claim for two reasons. First, as noted above, Chromalloy is relying upon a statement allegedly made after it submitted its bid, thus, Chromalloy cannot establish detrimental reliance upon the statement. Second, and more importantly, the Board lacks jurisdiction to entertain claims for promissory estoppel. *See, e.g., Selevive Group, LC*, ASBCA Nos. 63292, 63293, 22-1 BCA ¶ 38,220 at 185,638. We deny Chromalloy's claim regarding blade pricing.

## II. The Contract Permitted the Government to Provide Blades as GFM

Chromalloy contends that the government provided assurances that the blades would be contractor furnished material and that it was damaged financially when the government decided to provide the blades as government furnished material, leaving it with a stock of residual material. The contract explicitly provides that the government may supply the blades as GFM (R4, tab 19 at 3). Chromalloy's witnesses did not testify as to any assurances provided by the government that the blades would be contractor furnished. In fact, Ms. Mackell testified that the residual inventory blades were ordered accidentally by one of Chromalloy's business units. Chromalloy attempted to cancel the order, but GE refused the request because the blades were already being manufactured (tr. 64-65). We deny the appeal with regard to Chromalloy's claim regarding the change to GFM.

## III. The Government Has Not Violated A Prior Course of Dealings

Chromalloy asserts that the government violated a prior course of dealings in its submission of a large order at the end of the base contract period. According to Chromalloy, the order should have been submitted during the first option period, and priced according to the higher option period price. Our precedent recognizes a course of dealing as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Tech. Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,388 (*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 223 (1981)). "[A] course of dealing can supply an enforceable term to a contract . . . provided that the conduct which identifies that course of dealing can reasonably be construed as indicative of the parties' intentions – a reflection of their joint or common understanding." *Id.* (*quoting Sperry Flight Systems v. United States*, 548 F.2d 915, 923 (Ct. Cl. 1977)).

Here, Ms. Mackell testified that the government often issued task orders late in the contracting period, but for work that could be performed within 30 to 60 days (tr. 43). Ms. Mackell testified that the contracting officer, Mr. Matthews told her that he would have stopped the order had he been in the office when the order was issued (tr. 66). The contracting officer disagreed with Chromalloy's characterization of the order, indicating that the orders were highly variable because they were based on expected flying hours and that the government had frequently made even larger orders late in the contract period (tr. 90-91). Neither party asked Mr. Matthews about his alleged statement that he would have blocked the order had he been in the office. Based upon the evidence before us, we hold that Chromalloy has not demonstrated by preponderant evidence that there was a sequence of previous conduct indicating a joint or common understanding of the parties for interpreting the contract. At best, Chromalloy is speculating as to the government's reasons for placing orders of

8

different sizes at different times during the contract.  Speculation cannot "reasonably be construed as indicative of the parties' intentions [or] their joint and common understanding."  *Tech. Sys.*, 17-1 BCA ¶ 36,631 at 178,388 (*quoting Sperry Flight Systems*, 548 F.2d at 923).

The Federal Circuit recently issued an opinion addressing the pricing of work ordered in one contract year, but performed in a later contract year.  *WSP USA Sols. Inc. v. Army*, No. 2023-1256, 2025 WL 573242 (Fed. Cir. Feb. 21, 2025).  In *WSP* the court indicated that the entire contract, including modifications, should be reviewed in interpreting the contract.  *Id.* at *7.  Here, the two modifications to Task Order No. FA8122-21-F-0030 were both issued bilaterally.  By agreeing to a substituted performance in each modification, Chromalloy waived any potential claim regarding the timing of the purchase of additional blades.  *See, e.g., Amentum Services, Inc. F/K/A AECOM Management Services, Inc.* ASBCA Nos. 62835 *et al.*, 23-1 BCA ¶ 38,453 at 186,891.

IV.  <u>Chromalloy Has Not Established A Constructive Change</u>

Chromalloy's complaint additionally asserts that its claims addressed above were constructive changes to the contract (compl ¶ 26).  To the extent Chromalloy is raising a constructive change claim, such a claim would require evidence that Chromalloy 1) performed work beyond the requirements of the contract; and 2) that the additional work was ordered by the government.  *See, e.g., Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014).  However, Chromalloy has not alleged that it performed any work not required by the contract.

Chromalloy first alleges that the government had superior knowledge of blade pricing.  Here Chromalloy complains of pricing, not that it was required to perform extra work.  Chromalloy's second basis is that the government's switch to government-furnished material for the blades left it with excess inventory.  However, the contract explicitly provided that the blades could be GFM, and, thus, Chromalloy has not alleged additional work.  Chromalloy's third claim of a breach of the course of dealings again does not allege extra work.  Rather, Chromalloy is again complaining about the pricing of the blades, that is, whether the work should have been priced at the base year or option year prices.  Chromalloy does not allege that it was required to perform work not required by the contract and we deny Chromalloy's constructive change allegations.

CONCLUSION

For the reasons stated above, Chromalloy's appeal is denied.

Dated:  May 6, 2025

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63408, Appeal of Chromalloy Component Services, Inc., rendered in conformance with the Board's Charter.

Dated:  May 6, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals